This action was brought to recover damages for an injury received by Mrs. Dunn, which it may be conceded resulted from negligence of those in charge of a locomotive engaged in the transportation of material for the construction of the present State capitol.
After Taylor became the contractor to build the capitol he asked permission from the city council of the city of Austin to construct a railway on and over certain streets connecting the capitol site with the railways entering the city. Such a connection by rail seems to have been almost indispensable for the transportation of material brought to the city by rail, much of which was very heavy.
On January 6, 1883, an ordinance was passed giving this permission. The ordinance was as follows:
"Section 1. Be it ordained by the city council of the city of Austin, that the contractors for building the new State capitol, Mr. Abner Taylor and his associates, are hereby granted the right and authority to construct and operate a railway track, of the standard or less gauge, from the intersection of the Houston Texas Central and Austin 
Northwestern Railways with East Avenue, northward on East Avenue to College Avenue; thence westward on College Avenue to Brazos Street; thence on and across Brazos Street to the capitol grounds, for the use and purpose only of conveying to the capitol grounds material of any character to be used in the construction and erection of the new State capitol building; and it is expressly stipulated that said railway shall not be used for any other purpose.
"Sec. 2. The locomotive and cars used on said road shall at no time be run at a greater speed than six miles per hour, and all locomotives at night, when running, shall have a well-lighted headlight, and the usual light shall be displayed at the rear end of all trains. The locomotive bells shall also be distinctly rung at and before crossing every traveled street. The trestle-work over College Avenue across *Page 660 
Red River Street shall be so constructed as not to impede or hinder the travel on Red River Street; and at the crossing of any other street now used, or which may hereafter be used for vehicle travel, the crossing shall be planked and the adjacent ground on both sides shall be so graded as to form a safe and easy crossing.
"Sec. 3. Said capitol contractors, Mr. Abner Taylor and his associates, shall have and continue the use and occupation of said railway, as provided in the first section of this ordinance, until the said capitol building shall be completed, and no longer; and on the completion of the said capitol building, said capitol contractors shall, fit their own cost and expense, remove from said avenues and streets, on which the right of way is hereby granted, all the material used in the construction and occupation of said road, as well as all the rubbish accumulated by virtue of said use and occupation. Said capitol contractors shall enter into bond, with good and approved security, to the mayor of the city of Austin and his successors in office, in the sum of $10,000, conditioned that they will, within ninety days after the completion of said building, remove the material and rubbish referred to in this section.
"Sec. 4. Said Contractors, Abner Taylor and his associates, shall be liable and responsible to any and all persons for any damage or injury that may result to him or them or their property from the construction, use, and maintaining of said railway.
"Sec. 5. The right of way is hereby also granted to said capitol contractors on Pine and Cedar Streets for such curvatures as may be necessary to form proper connection with the Houston Texas Central and Austin Northwestern Railway tracks.
"Sec. 6. The rights and privileges granted by this ordinance are a gratuity to the contractors for building the State capitol, as herein mentioned, and said rights and privileges shall not be sold or transferred to any other parties; therefore, if the contract for building said capitol now existing between the capitol syndicate and the State of Texas shall, at any time before the completion of the said capitol building, be annulled, then at the same time the right of way and all of its privileges, as herein granted, shall be null and void, and this ordinance shall no longer be in force; and it is further provided that if at any time said capitol contractors shall fail to observe the conditions of this ordinance, then such failure shall operate as a forfeiture of the grant herein made.
"Sec. 7. This ordinance shall take effect and be in force from and after its passage, and all ordinances and parts of ordinances in conflict with this ordinance are hereby repealed."
The bond executed in pursuance of this ordinance is as follows:
"State of Texas, County of Travis. — Know all men by these presents, that we, Abner Taylor as principal, and A.C. Babcock, C.B. Farwell, and John V. Farwell as sureties, are held and firmly bound unto W.A. *Page 661 
Saylor, mayor of the city of Austin, and his successors in office, in the penal sum of $10,000, for the payment whereof well and truly to be made we jointly and severally bind ourselves and each of us, our and each of our heirs, executors, administrators, and assigns.
"Given under our hands this the 9th day January, A.D. 1883.
"The condition of the above obligation is such that whereas on the 6th day of January, 1883, the city council of the city of Austin passed an ordinance granting to the (contractors of the new State capitol, Abner Taylor and his associates, the right to construct, maintain, and operate a railway on East and College Avenues for the purpose of conveying building material to the capitol grounds, and by the third section of the said ordinance it is provided that said capitol contractors, Abner Taylor and his associates, shall have and continue the occupation and use of said railway, as provided in the first section of said ordinance, until the said capitol building shall be completed, and no longer; and on the completion of said capitol building said capitol contractors shall, at their own cost and expense, remove from said avenues and streets on which the right of way in said ordinance is granted all material used in its construction, as well as all the rubbish accumulated by virtue of said use and occupation.
"Said capitol contractors shall enter into bond, with good and approved sureties, to the mayor of the city of Austin and his successors in office, in the sum of $10,000, conditioned that they will, within ninety days after the completion of said building, remove the material and rubbish referred to in this section.
"Now, if the said Abner Taylor and his associates shall remove the material and rubbish referred to, and shall grade the streets as they originally were, to the satisfaction of the street committee of the city council, within the time prescribed after the capitol building shall have been finished, and shall keep the railway track and all street crossings so that they shall, at all times, be an easy and safe crossing for vehicles at the proper crossings, and should the said Abner Taylor and his associates fail to remove the rubbish aforesaid and keep the crossings in repair, so that there shall be easy and safe crossings, then the city engineer and street committee of the city of Austin shall have the same repaired and collect the amount for such repairs from said Abner Taylor, his associates, and the sureties on this bond; that for a violation of this bond suit, may be brought and legal proceedings instituted at the city of Austin, Travis County, Texas, and that a recovery on the bond shall not render it void, but it shall remain in full force and effect until the whole penalty of the bond shall be exhausted. If the said Abner Taylor and his associates shall do and perform all the obligations, stipulations, and requirements in the said ordinance granting the right of way and this bond required, this instrument shall be null and void, otherwise to be and remain in full force and effect." *Page 662 
The case was tried without a jury, and with others the court made the following findings: "Defendant Taylor in July, 1885, made a sub-contract with Gus. Wilke, by which Wilke was to furnish the material and to complete the capitol building. In the contract Wilke was to have the full use of the railway and cars, etc. This full control he had, the supervision over the work being by the commission representing the State, and Taylor's agent present and representing defendant, but having no control over the employes.
"December, 1885, Wilke applied to the city council for leave to lay an additional rail upon the track and to make connection with the Austin Northwestern Railway track. In January, 1886, the ordinance passed granting to Wilke said privileges, and at once the additional rail was placed and the conceded connections made. This was needed for conveying granite to the capitol, and the cars in use April, 1886, were in use conveying the granite from the Austin Northwestern Railway, and it is evident that the city authorities knew of Wilke's using the Abner Taylor Railway, and for the purposes for which it was made.
"Since Wilke's subcontract July 25, 1885, be has carried on the construction of the capitol building, hiring and paying hands and directing their movements. Taylor, however, has an agent and supervisor present protecting his interests. The State capitol commissioners superintend, Taylor's agent watches the work as it progresses, makes monthly reports, etc., for Taylor." * * *
The fifteenth finding of fact is as follows: "The concession to Wilke did not in its terms relieve Taylor from the conditions under which the road was built and operated. The two ordinances will be taken together in determining the obligations upon those using the road."
It was proved by witnesses that from August 1, 1885, to the date of the trial Wilke had been in full possession of the railway, and that he had during all of that period operated and used the same in carrying granite and other material to the State capitol grounds, and that all the engineers, firemen, brakemen, employes, and servants of every character whatever, who during that period of time operated and managed said railway and the engines and cars used thereon, were the employes of Wilke, by him employed and paid for their work, and subject to control, direction, find discharge by him alone. And that from and after August 1, 1885, defendant had no control over said railway, and had no control or management over any employe employed in the use and operation of the railway.
The ordinance passed at the request of Wilke was as follows:
"Section 1. Be it ordained by the city council of the city of Austin, That Gus. Wilke is hereby granted the privilege of connecting by a Railway track the tracks of the Austin 
Northwestern Railway and *Page 663 
the Abner Taylor Railway, and to lay a side track on East Avenue, south of Pecan Street, and a third rail on the roadbed of the said Abner Taylor Railway from the point where said Wilke shall connect with the same to the terminus at the State capitol.
"Sec. 2. The right of way along East Avenue and Cedar Street necessary to the enjoyment of the privilege conferred by this ordinance is hereby granted to the said Gus. Wilke, and he is fully authorized to run trains over said connection at such time as he may deem necessary until the completion of the new capitol building, at which time it is hereby made the duty of said Wilke to remove, at his own cost, the rails, crossties, and other obstructions placed by him on said streets in the connection and use of said Austin Northwestern Railway and the said Abner Taylor Railway.
"Sec. 3. All the work done by said Wilke under and by virtue of the privileges hereby granted shall be under the supervision and in strict conformity to the plans of said work now on file in the office of the city clerk, provided that all of said track shall be made so that the top of the rail shall conform to the grade of said streets as the same shall be fixed by the city engineer.
"Sec. 4. It is hereby made the duty of said Wilke to put such street crossings and culverts along the line of said connection as may be required by the city engineer, and a failure to do so shall be held and taken as a forfeiture of all right conferred on him by this ordinance.
"Sec. 5. This ordinance shall take effect and be in force from and after its passage."
The fourth paragraph of the contract between Taylor and Wilke was as follows: "Whereas the party of the first part owns a railway connecting the capitol grounds with the Houston Texas Central Railway, and a locomotive, it is understood and agreed that the party of the second part is to have the use of said railway and locomotive during the continuance of this contract, and is to keep said track and locomotive in repair at his own cost and expense and pay the taxes on the same, and is to turn them over to the party of the first part at the expiration of this contract in good order, and is to save the party of the first part harmless from all damage of any kind and description that may arise from operating and running said road for the hauling of material for said building, and is to comply with all ordinances passed by the city council in relation to said road, and is to save the party of the first part harmless upon a bond executed to the city to restore the streets to the same condition they were before said road was built."
The findings of law were:
"1. That the ordinance prescribing the conditions upon Abner Taylor in building and working the road upon College Avenue was within the corporate powers of the city of Austin. *Page 664 
"2. That the effect of the ordinance of January, 1886, giving to Wilke certain privileges, did not by necessary implication repeal or supersede the former contract with Taylor.
"3. That Wilke had the contract under Taylor to build the capitol did not release Taylor from liability.
"4. That the State owns the fee of the streets and was by its contractors engaged in building the State capitol, a public, building, did not give Taylor or Wilke the right to use the streets without control of the city ordinances. The right to use the streets certainly inured to the contractors, but under reasonable limitations for the safety of persons traveling upon the streets. That the city and Wilke may both be liable, such liability does not relieve Taylor.
"5. Taylor, the defendant, is liable to the plaintiff for the injury caused to Mrs. Dunn."
On these findings a judgment was entered for the plaintiffs for $2000.
There is no claim that the injury resulted from the improper construction of the railway, but from the evidence it must be held that it resulted from the careless operation of a train on the road while it was operated by persons in the employment of Wilke, who, under the uncontroverted evidence, must be deemed to have been an independent contractor.
Under this state of facts to fix liability on Taylor it must be shown either that he placed the railway in the street without authority, and that from its nature and the use to which it was applied it was a nuisance, and he therefore liable, although the injury occurred while it was operated by Wilke, or that he is liable under contract growing out of the ordinance under which he constructed the road or out of the bond which he executed.
It must be conceded that appellant is liable for the injury received by Mrs. Dunn, notwithstanding the railway was operated by Wilke as a contractor, if the structure in the streets and its operation necessarily created a nuisance; but if the construction of the railway in the streets was lawful, and thereon might be lawfully used such motive power and cars as were used, then appellant is not responsible for an injury which resulted from the negligent use of them by Wilke while operating the road and trains as a contractor, unless he is liable by contract.
It is claimed by appellant that, under the law providing for the erection of the State capitol and contract to erect it, he had the legal right to place the railway in the streets and to run on it trains propelled by steam; and he denies the right or the authority of the city council to control the exercise of the right he thus claims, to the end that he may avoid any effect which may be given to the fourth section of the ordinance which assumed to confer upon him the right, and to avoid any effect that may be given to the bond which he executed in part at least in pursuance of that ordinance. *Page 665 
On the other hand appellees concede that the city council had the power to authorize him to construct the railway on the streets, and to run trains thereon propelled by steam, and through this claim that appellant is bound by the ordinance and his bond, and therefore liable, although the road may have been operated and controlled by Wilke as a contractor at the time the injury was received.
We find nothing in the law authorizing the building of the State capitol, or in the contract made in pursuance of it, which confers on appellant any other right to the use of streets than would have any individual engaged in erecting a structure of like character for himself or for any other private person.
Every person so engaged would have the right, without the consent of the city authorities, to use the streets in any lawful manner for the transportation of material, and if it became necessary, on account of the great weight or size of material necessary to construct the building in accordance with the contract, for appellant to obstruct a street temporarily for that purpose, he would have had the right to do so without subjecting himself to liability for creating a public nuisance, whatever might be his liability to owners of property abutting on the street or to persons injured by the negligent performance of the acts within themselves lawful.
The primary purpose of a street is for the passage of persons and transportation of things in such manner and in such vehicles as may be in ordinary use on streets or may become necessary, and it is not every obstruction of the ordinary use of a street which is illegal, even though such use may not be expressly authorized by statute or municipal ordinance; and for the purpose of determining the legality of any extraordinary use to which a street may be applied it becomes necessary, in this particular case, to look to the character and purpose of the use, and if this be not one essentially different from that for which streets exist the use ought not to be held to create a nuisance public in its character, even though it be extraordinary and such as subject the public to inconvenience for a time.
Necessity may and frequently does justify the use of a street or streets for the purpose of transporting things in an unusual manner, or for the purpose of transporting such things as necessarily obstruct a street for the time, but such uses are not necessarily illegal, for streets as passways must frequently be subjected to uses strictly in the line of the purposes for which they exist, but unusual because of the nature of the things to be transported or of the vehicles necessary to their transportation.
As said by Mr. Dillon: "It is not every obstruction, irrespective of its character or purpose, that is illegal, even although not sanctioned by any express legislative or municipal authority. On the contrary, the right of the public to the free and unobstructed use of a street or way is subject to reasonable and necessary limitations. The carriage *Page 666 
and delivery of fuel, grain, goods, etc., are legitimate uses of a street and may result in a temporary obstruction to the right of public transit. So the improvement of the street or public highway itself may occasion impediments to its uninterrupted use by the public. And so of the improvement of adjoining lots by digging cellars, by building, etc.; this may occasion a reasonable necessity for using the street or sidewalk for the deposit of material. Temporary obstructions of this kind are not invasions of the public easement, but simply incidents to or limitations of it. They can be justified when and only so long as they are reasonably necessary. There need be no absolute necessity; it suffices that the necessity is areasonable one. But this will never justify the leaving of the street or way in an unsafe and dangerous condition, or its use in an unreasonable manner or for an unreasonable time." Dill. on Mun. Corp., 730.
The record before us shows that the use of streets of the city of Austin was necessary for the purpose of conveying the material of which the capitol was required to be built to the place where it was required to be constructed, and that such was the character of some of the material that the use of a railway whose cars were propelled by steam was necessary for its transportation. All these considerations give force to the proposition that it was proper for appellant to have passway over some of the streets of the city for such vehicles as were necessary for transportation of material to be used; but we do not deem them sufficient, in view of the passway required and of the power to be used in propelling cars upon it, to maintain the proposition that appellant could use any of the streets in the manner he did without the sanction of the municipal authorities, to whom was given the control of its streets and upon whom was placed the duty and responsibility of keeping them in repair.
The railway to be placed in some of the streets would necessarily, to some extent, obstruct the ordinary use, and the city authorities certainly had power to require it to be placed on such streets and so constructed and operated as would cause the least inconvenience and reduce to the minimum the necessary inconvenience to the public.
In view of the legislation in this State, as well as constitutional provisions, it may be true that every incorporated town or city through its municipal authorities has power to consent to the use of its streets so far as necessary for the construction and operation of a railway for any lawful purpose, even in the absence of an express grant of such power in its charter, and even though cars thereon are to be propelled by steam or other like agency.
The Constitution withdraws from the Legislature the power to authorize the construction and operation of street railways "within any city, town, or village, or upon any public highway, without first acquiring *Page 667 
the consent of the local authorities having control of the street or highway proposed to be occupied by such street railway." Const., art. 10, sec. 7.
By street railway as used in this section of the Constitution was probably meant such railways as are constructed and operated in towns, cities, and villages on streets for carrying passengers or like purposes, which are frequently propelled by power other than animal, but it tends to show that it was intended to leave to municipal authorities the right and power to determine whether streets should be used for railways of any character constructed and to be operated only within the limits of a municipality.
The general incorporation act provides that corporations may be incorporated for the purpose of constructing and operating street railways (Sayles' Civ. Stats., art. 566), but it does not provide how they shall acquire the right to use streets; nor does the general law in reference to the incorporation of cities and towns seem to expressly provide for this. The law further provides that no part of the chapter in the Revised Statutes regulating the mode of acquiring and using right of way by ordinary railway companies "shall be so construed as to authorize the construction of any railway upon or across any street, alley, square, or highway of any incorporated city or town without the consent of the corporation of said city or town." Rev. Stats., art. 4173.
This further evidences an intention to confer on the municipal authorities full control of the matter of constructing and operating ordinary railways on streets in the absence of legislation to the contrary, and while these laws have no direct application to such a railway as that constructed by appellant they evidence the intention that municipal authorities may and shall exercise a broad discretion as to the use of streets by such structures.
It was expected that the railway to be constructed by appellant should remain on the streets on which it was permitted to be constructed so long as its use might be necessary in transporting material for the capitol, and in view of the magnitude of that work it must have been contemplated that it would remain there for several years.
It is the duty of a municipal corporation charged with an obligation to keep its streets in good order to restore them to that condition when from any cause they have ceased to be in good order, and if temporarily they are permitted to be so used for a necessary purpose as to obstruct them, it is the duty of such a corporation, as soon as the cause for the necessary obstruction is removed, to restore them or to provide for their restoration and to see that this takes place.
While a municipal corporation can not legalize a nuisance, it has power to control the use of streets for a lawful purpose, and as it may become liable for the improper use or condition of streets while occupied by persons permitted to use them for a proper but unusual purpose *Page 668 
which may be attended with inconvenience or even danger, it may require indemnity from such person, on which to rely in case cause of action results against it from such person's act or omission.
Looking to the general laws in force in this State, to the charter provisions of the city of Austin, and to the character of the use to which appellant desired to appropriate streets, and also to the period for which it was expected and contemplated that the streets should be so occupied, we are of opinion that appellant had not the right to use the particular streets or any others for the purpose for which he did use them without the consent of the municipal authorities, and that they had power legally to permit him to use them for the contemplated purpose so long as this was necessary.
This action is based on the ordinance granting the use of the streets to appellant, the bond executed by him, and his liability under the general principles of law applicable to the facts stated; and we may now state, as seems to be conceded by appellee, unless liable under the ordinance or bond, that he is not liable at all; for it can not be claimed that the injury made the basis of this action resulted from any improper construction of the railway, but from the negligent operation of a train by the servants of Wilke, who is shown to have been an independent contractor. And this brings us to the inquiry whether the ordinance or bond, or both, fix liability on appellant.
It is claimed that the ordinance and bond created a contract between appellant and the municipal authorities, whereby the former is bound to make compensation for the injury, although Wilke was operating the railway as a contractor, and the negligence of his servants the direct cause of the injury; and it is further claimed that under the terms of the ordinance appellant had no right to transfer to Wilke the right to operate the railway, that his doing so operated a forfeiture of his own right to use the streets, and that for this reason the railway and its operation became a nuisance per se, which made appellant liable because be authorized Wilke to operate it.
The sixth section of the ordinance did provide that the rights and privileges conferred by it would not be sold or transferred to other parties, and that the ordinance should cease to have effect if the contract for the erection of the capitol should be annulled; but we are of opinion that the intent of this was to confine its use to the transportation of material for the contemplated building, which was the sole purpose for which the privilege was granted, and that the agreement between appellant and Wilke, whereby the latter, as between themselves, acquired the right to operate the road, did not operate such a sale or transfer as under the ordinance would revoke, the right conferred on appellants; but if the ordinance was susceptible of a contrary construction, then there can be no doubt that the subsequent ordinance, passed at the request of Wilke as a contractor, would confer upon him the *Page 669 
right to use the railway in the contemplated work, and thus operate as a ratification or legalization of the agreement between appellant and Wilke.
It may be conceded that this, however, did not relieve appellant from any obligation imposed on him by the ordinance or bond under which he acquired the right to construct and operate the railway, but it did relieve him from any liability that might have rested upon him had Wilke for him been performing a service unlawful in itself, even as an independent contractor, through which the injury occurred. From this it follows that if appellant is liable this liability must exist, as claimed by appellee, under contract created by the ordinance or bond through which he acquired the right to construct and operate the railway, or through both. So much of the ordinance as relates to the giving of a bond is as follows:
"Section 3. Said capitol contractors, Mr. Abner Taylor and his associates, shall have and continue the use and occupation of said railway, as provided in the first section of this ordinance, until the said capitol building shall be completed, and no longer; and on the completion of said capitol building said capitol contractors shall, at their own cost and expense, remove from said avenues and streets on which the right of way is here granted all the material used in the construction and occupation of said road, as well as all the rubbish accumulated by virtue of said use and occupation. Said capitol contractors shall enter into bond, with good and approved security, to the mayor of the city of Austin and his successors in office, in the sum of $10,000, conditioned that they will, within ninety days after the completion of said building, remove the material and rubbish referred to in this section."
This prescribed the character of the bond which was required to be given, and the purpose of requiring it manifestly was to secure to the city indemnity for such expenses as it might have to incur in restoring the streets to their former condition after the capitol was completed in case appellant did not.
It was eminently proper that the city should require such a bond as the ordinance prescribed, and that it should prescribe the police regulations found in other parts of the ordinance; but as the ordinance did not require a bond conditioned that appellant would perform all the obligations, stipulations, and requirements in the ordinance granting the right of way, it is evident that so much of the condition of the bond can not be made available to a third person, even if it could avail the city as a means of indemnity against liability to which it might be exposed, and so much of the bond as the ordinance required can have no application to the fourth section of the ordinance on which appellee relies to fix liability on appellant, which is as follows:
"Section 4. Said contractors, Abner Taylor and his associates, shall be liable and responsible to any and all persons for any damage or injury *Page 670 
that may result to him or them or their property from the construction, use, and maintaining of said railway."
This but asserts a rule of law which all persons might invoke on receiving injury to person or property as well without as with the ordinance; for the injury therein referred to could only be such as might result from some unlawful act by appellant in constructing, using, or maintaining the railway, and it would not be contended that such a municipal ordinance could have the force of the law and thus give a cause of action when none would exist under it considered as a contract. That section of the ordinance was evidently inserted for the purpose of avoiding all controversy as to the primary liability of appellant for such injuries as might result from the construction and maintenance of the railway, and not for the purpose of conferring on individuals causes of action against appellant which they would not otherwise have. So limited, it ought to be held that, as between appellant and the city, that section of the ordinance, became a contract upon the acceptance of the rights conferred by the ordinance, to which the city might look, and which it might enforce in any case in which it as well as appellant might be liable on account of his acts or omissions.
So far the city would evidently have power to contract, but it is difficult to find any provisions in its charter which would give plausibility to a claim that it had power to make a contract solely for the purpose of conferring on individuals a cause of action they would not otherwise have. It was only empowered to make such contracts as relate to the municipality and are necessary to enable it to exercise the powers conferred by its charter or some general him.
In the case of Becker v. Keokuk Waterworks, 79 Iowa 419, it appeared that the city of Keokuk, by ordinance, granted to the waterworks company the right to construct and maintain its works in the city, and contracted with it for a supply of water for fire and other purposes, and the ordinance contained a provision that "this grant to the waterworks company being conferred with the expressed condition that said company shall be liable for all injury to persons or property caused by the negligence, mismanagement, or fault of itself or its employes while engaged in the construction or operation of said works." The company failed through its own fault to supply water in accordance with its agreement, and in consequence of this Becker's property was burned, and he brought an action against the company to recover its value, and a demurrer was sustained to his petition. In disposing of the case the Supreme Court of Iowa said: "Municipal corporations have and can exercise only such powers as are expressly granted to them by law and such incidental ones as are necessary to make these powers available and are necessary to effectuate the purposes of the corporation, and these powers are strictly construed. Clark v. City of Des Moines, 19 Iowa 212; McPherson v. Foster, 43 Iowa 57. The *Page 671 
law which authorizes cities to contract with individuals and companies for the building and operating of waterworks confers no power upon a city to make a contract of indemnity for the benefit of individual taxpayers for the breach of which he could maintain an action in his own name. In view of the law applicable to such cases, the provision of section 18 relied upon, considered in connection with the entire ordinance, must be construed to refer to injuries for which the city would have been liable if caused by negligence, mismanagement, or fault on its part."
In Blake v. Ferris, 1 New York, 48, it appeared that persons for their own benefit obtained permission from the municipal authorities to construct a sewer in a public street, and the ordinance through which permission was given provided that the "grantees should cause proper guards and lights to be placed at the excavation of the drain for the prevention of accidents, and be answerable for any damages or injuries which might be occasioned to persons, animals, or property in any manner connected with the construction of the sewer." The persons to whom the right to construct the sewer was given employed another person to do the work under such circumstances as to make him an independent contractor, and through the fault of that person in leaving the sewer open and unguarded at night the plaintiff's horses and carriage were driven into it, and he brought an action against the persons having the sewer constructed to recover damages for the injuries thus resulting. It was held that the provisions before quoted from the ordinance could not inure to the benefit of the plaintiff or strengthen his right. This case has been criticised in other respects in subsequent cases, but so far as we are advised never has been questioned in the State in which the cause was decided in so far as the ruling before mentioned is concerned.
In City of Kansas v. O'Connel, 99 Missouri, 357, it appeared that O'Connel entered into a contract with the city to construct a sewer for the city, and gave bond to secure the performance of the contract, which contained the following: "It is further distinctly agreed that the said party of the first part shall be responsible for all unlawful damages to persons or property from negligence or carelessness in doing said work, or in not using proper precautions between commencing and completing the job, by barricades, signals, lights, or otherwise to prevent injuries to persons or property from said work and the approaches thereto, and shall indemnify the City of Kansas against all loss or claim for damages on account of such neglect or carelessness."
By the negligence of O'Connel and his servants while engaged in the work Mrs. Blum was injured, and the city brought an action on the bond for her use to recover damages for the injury, but on demurrer it was held that the petition stated no cause of action on the bond, for the reason that the "purpose of the bond is to secure a performance of the *Page 672 
work according to the terms of the contract, and to protect and save harmless the city from damages occasioned by the negligent acts of the contractor and his servants. In these respects it is not an agreement with the city for the benefit of third persons, but for the protection and benefit of the city. * * * It does not profess to create any obligation in favor of third persons save in the single case of laborers," as to whom there was an express provision about their payment. The court in that case deemed it not necessary to decide whether the city could have made a contract available to third persons for injuries received through the negligence of the contractor.
The rulings in these cases are in accordance with the construction which we believe should be placed on the ordinance relied upon in this case, and we therefore hold that the ordinance was only intended to secure indemnity to the city of Austin; but as counsel for appellee relies for the maintenance of the judgment on a decision made on a like ordinance by the Supreme Court of the United States it will be considered.
The city of St. Paul desiring to have waterpipes laid in its streets, passed an ordinance authorizing a water company to lay them, and one of the sections of that ordinance was as follows: "The said water company expressly agrees to protect all persons against damages by reason of excavations made by them in the said city in laying pipes, and to keep the said excavations properly guarded by day and night, and to become responsiblefor all damages which may occur by reason of the neglect oftheir employes in the premises, and that the streets and highways in said city shall not be unnecessarily obstructed or incumbered in laying said pipes." The water company accepted the ordinance and made a contract with one Gilfillan to do the entire work, under which he became an independent contractor. The excavation and embankments formed by throwing out the earth covered the greater part of a street, but there was room unincumbered for vehicles to pass, and while the street was in that condition Ware attempted to pass in a carriage, when persons in charge of an engine used to propel a drill started the engine suddenly, without notice, when the carriage was near to it, whereby the horse in the carriage became frightened and unmanageable and the carriage was turned over and the plaintiff injured. No barricade or signal of any kind existed to indicate danger, except as the embankment and consequent narrowness of the passway together with the excavation may have done so.
In view of the opinion in the case we think it ought to be conceded that the Supreme Court of the United States held the water company liable for the injury on the ground of contract contained in the ordinance, for it was not shown that the injury resulted from any cause necessarily incident to the work which the company contracted to do, but from the negligence of the contractor or his servants in the negligent *Page 673 
use of the steam engine while the plaintiff was passing through the narrow passway caused by the embankment which may have contributed to the injury.
The general rule of law applicable to such cases is thus clearly stated in the opinion of the court: "When the obstruction or defect caused or created in the street is purely collateral to the work contracted to be done, and is entirely the result of the wrongful acts of the contractor or his workmen, the rule is that the employer is not liable; but when the obstruction or defect which occasioned the injury results directly from the acts which the contractor agreed and was authorized to do, the person who employs the contractor and authorizes him to do those acts is equally liable to the injured party."
This holding of the law, as to the correctness of which there can be no controversy, it seems to us would require a decision in favor of the water company on the facts other than the contract made by acceptance of the ordinance, and for this reason, in addition to the direct holding that the water company was liable to the third party on the ground of contract, we conclude that the decision is based on the proposition that the ordinance inured to the benefit of the injured party, and that on a contract thus created he might maintain an action. Water Co. v. Ware, 16 Wall., 566.
With the highest respect for the opinions of that court, always distinguished for ability and learning of its judges, it seems to us that the true construction of such a contract made with a municipal corporation would require a holding, as in the cases before cited, that it was a contract for the indemnification of the city, and not intended by the parties to it as a contract for the benefit of individuals, on which a person injured by the negligence of a contractor or his employes might maintain an action.
In construing such a contract, the power of a municipality to contract, as well as the subject matter of the contract and the purpose intended to be accomplished by it, should all be looked to, and it ought never to be inferred that a contract made by a municipal corporation was intended to inure to the benefit of an individual, further than this may be necessary for the protection of the municipality, unless its charter expressly or by necessary implication confers the power to make contracts to inure to the sole benefit of individuals, and the intent so to do clearly appears in the contract itself.
In the case before us it does not appear that the construction, use, or maintenance of the railway at the place where the injury occurred was necessarily attended with danger to persons passing on the street, nor does it appear that the accident was caused by any defect in the construction of the railway; but it does appear that the injury resulted from the negligence of employes of Wilke in operating the train, and under this state of facts it is clear that appellee could not successfully *Page 674 
have maintained an action against the city for the injury. This being true, the right of appellee must be determined by the general principles of law, without reference to the ordinance, and the application of these to the facts, requires a reversal of the judgment.
As the cause was tried without a jury, the judgment will be reversed and such judgment here rendered as ought to have been in the court below, which will be that appellee take nothing by this action. It is so ordered.
Reversed and rendered.
Delivered May 5, 1891.