**WALES TRUCKING COMPANY,
Petitioner,**

**v.**

**Louis STALLCUP et al., Respondents.**

**No. B–2718.**

Supreme Court of Texas.

Nov. 24, 1971.

Rehearing Denied Dec. 22, 1971.

Fillmore, Lambert, Farabee & Purtle, Larry Lambert, Wichita Falls, for petitioner.

Short & Helton, R. M. Helton, Wichita Falls, for respondents.

GREENHILL, Justice.

This is a suit for damages for an alleged nuisance arising out of a lawful, non-negligent use of a public highway. The City of Wichita Falls, needing additional fresh water, was building a pipeline from a lake to the city. In making many trips to deliver the pipe to the site of the construction, the trucks of the defendant truck company, while traveling an unimproved county

road, caused dust which was offensive to the plaintiffs. Trial was to a jury resulting in a judgment for the plaintiffs. The court of civil appeals affirmed. 465 S.W. 2d 444. We reverse.

The background is that the city employed the A & A Construction Company to build the water pipeline from Lake Arrowhead to a city plant, a distance of some 13 miles. The roadway in question was used as an access to the pipeline right-of-way during about five miles of its construction.

The concrete pipe was manufactured and sold by the Gifford-Hill Company in Grand Prairie. The defendant, Wales Trucking Company, was employed as a subcontractor to transport the pipe to the job. Several individuals owned and drove their own trucks, and Wales leased these trucks (with owner-drivers) to deliver the pipe. As relevant here, all were under the control of Wales. The trucks varied in size, but all were duly licensed and were within the load limits fixed by law for the deliveries over public highways.

The house of the plaintiffs, Mr. and Mrs. Stallcup, was on some acreage which adjoined a public county road. Their house was set back some 75 feet. The road is described as "a typical unpaved county road," "a dirt road," a road with a gravel surface, "kind of road gravel material." Some red gravel had been put on it by the county because in wet weather, the school bus could not stay on the road. No load limit was prescribed for the use of the road which was publicly owned and maintained. The area was rural and thinly populated. The road ultimately ended on a ranch some distance past the plaintiffs' house. Mr. Stallcup testified that the road was little used before the pipeline project began.

Then, for about four months during the summer, the road was used by the defendant's trucks delivering pipe for a segment of the water pipeline. The pipe was laid in a bed of sand, and the same road was also used by other people delivering sand in heavy trucks to the pipeline right-of-way. The road was used as well by inspectors, engineers, laborers and other employees of the general contractor, and by some members of the general public. But the evidence from the plaintiffs is that the dust problem was really caused by the trucks transporting the heavy pipe, and the Wales Trucking Company is the sole defendant.

The pipe being delivered was in 16-foot lengths and was 54 inches in diameter. Most, 80 to 90 per cent, of the trucks leased by the defendant Wales were of such size as to carry two lengths of pipe; and when loaded, they weighed about 58,000 pounds. A few were heavier and could carry three. Because of the distance from Grand Prairie to the site, and because of a ruling of the ICC that these trucks could be driven only 10 hours per day, the general rule was that each truck and driver could make only one delivery per day. Over the period of the four months, approximately 825 truck loads were delivered; and, upon unloading the pipe, the 825 trucks returned past the plaintiffs' house. As set out in the opinion of the court of civil appeals, the number of pipe deliveries per day varied from zero to 20, depending upon the weather and production schedule.

The trucks bringing sand for the pipeline were of comparable size (58,000 pounds loaded); and the sand trucks made about one trip to three for the pipe trucks. But no complaint is made of their operations.

Apparently, the delivery of the pipe to this sector of the project began in the latter part of April. Around the first of May, the plaintiff Stallcup called the defendant company to complain about the dust caused by the passing trucks. He suggested that the road needed to be oiled or something. Defendant's superintendent, Malmay, in turn called the general contractor, A & A Construction Company. Malmay considered that the right-of-way for delivery of the pipe was the general con-

tractor's responsibility. Malmay then went out to visit Stallcup and discussed the matter with him. Malmay said he would ask the truck drivers to slow down, and he testified that he did so.

Then Malmay found an alternate route for the delivery of the pipe. It was a paved county road, and its use completely avoided driving by the plaintiffs' house. So defendant's trucks began immediately to use the alternate paved route. But a county commissioner considered that the trucks were damaging the paved road. So after a couple of weeks, the county commissioners enacted an order prescribing a load limit on the paved road which precluded its use by the defendant's trucks. The commissioner testified that he sent the notice of the order to Gifford-Hill, the company who manufactured and sold the pipe. But the commissioner went out personally and stopped the defendant's trucks in their use of the paved road, and load limit signs were erected on the paved road.

After the two or three weeks' use of the paved road, the trucks went back to the unpaved road in front of the plaintiffs' house, the only road available. It is undisputed that the dust was severe, "was like snow." The exterior of plaintiffs' house was coated with it, and the roof was discolored red from the red dust. It was particularly troublesome to the plaintiffs' daughter who had a respiratory problem. The plaintiffs' house had central air conditioning, but they had to keep a fan going right near the daughter at night to give her plenty of air.

The road in question had no load limit and no particular speed limit. As set out in the opinion of the court of civil appeals, the defendant's trucks, when loaded, drove past the plaintiffs' house 25 to 30 miles per hour. On their return, empty, they drove 45 to 50 miles per hour.

As stated, the plaintiffs abandoned their grounds of recovery based upon any negligence. They concede in their brief in this Court that "Wales used the Stallcup road nonnegligently," and that "in the use of the road, Wales violated no rule, regulation, statute, or custom." The case was submitted to the jury only upon the theory of nuisance. The jury found that the defendant's use of the road caused substantial amounts of dust to be deposited on the plaintiffs' property, and that "such depositing of dust * * * was the result of a nuisance." "Nuisance" was defined to mean "any *condition* brought about by one party in the use of a public road, so unreasonable and excessive" that it necessarily caused injury, damage, harm or inconvenience to another party, taking into consideration the nature and use of the road, et cetera. The jury found that as a result of the nuisance, the plaintiffs lost temporary use of their house and suffered temporary discomfort; that the nuisance was continued after notice to the defendant, but that the defendant did not act with malice. Damages were fixed at $2,500 each for temporary personal discomfort and for temporary loss of enjoyment of the house.

As Prosser states, "There is no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.' It has meant all things to all men, and has been applied indiscriminately from an alarming advertisement to a cockroach baked in a pie." Prosser, The Law of Torts (3rd ed. 1964) 592.[1] There is a general agreement that it is incapable of any exact or comprehensive definition, and we shall attempt none here.

We are familiar with a substantial body of law which says that a nuisance may arise where the defendant carries on an abnormally dangerous activity, or where he conducts, on his property, an enterprise such as a carbon black plant, a stockyard, or slaughterhouse.

---

1. Prosser uses even stronger language in a law review article. He says that "nuisance, unhappily, has been a sort of legal garbage can." Nuisance Without Fault, 20 Tex.Law Rev. 399 at 410 (1942).

Harper & James classify this type of nuisance as "(3) a more or less continuous interference with the use and enjoyment of property by causing or permitting the escape of deleterious substances or things, such as smoke, odors, noises, etc."[2] Prosser observes that most of those cases (which have arisen where there is no violation of law or negligence, or "nuisance without fault,") have been in equity and concerned the question of *future* damage, "so that the question is not really the nature of the defendant's original conduct but whether he shall be permitted to continue it." Prosser, Nuisance Without Fault, 20 Texas Law Review 399 at 418 (1942).

And, where there is a permanent industrial plant which will continue to cause physical discomfort to people and damage to neighboring property, Harper & James explain as to damages that " 'Nuisance' has remained an isolated island of liability without fault and courts have resorted to 'nuisance' terminology to impose liability [in damages] when prompted by policy considerations emerging from the idea of the inviolability of private property rights, enterprises involving high risks, and the notion that expanding industry with its high profits should make good for loss caused to innocent bystanders in the role of nearby property owners."[3]

Thus, in Columbian Carbon Co. v. Tholen, 199 S.W.2d 825 (Tex.Civ.App.1947, writ refused), this court upheld a finding of nuisance and resultant monetary damages from the operation of a carbon black plant which deposited soot on the plaintiffs' nearby house, even though the carbon black plant was not operated in a negligent manner. To the same effect is King v. Columbian Carbon Co., 152 F.2d 636 (5th Cir., 1946).

A difference here is that in the carbon black and similar cases, the offending activity is conducted on the private land of the person or firm which creates the offending dust, soot or odor. The offending activity in these types of cases is generally conducted deliberately and may be expected to continue. And, generally speaking, the conditions are within the control of the operator of the plant or premises. We here deal with a temporary activity caused by the use of a public road.

In contrast to the carbon black cases, there are opinions which hold that the primary function of streets and roads is for travel and transportation;[4] that they may be used for the convenience of the public by the ordinary and usual modes of conveyance;[5] and that motor trucks are now a common means of transportation; and, except where the size and character of such vehicle has been restricted or prohibited, their use upon public roads is authorized.[6]

Thus in the early case of Limburger v. San Antonio Rapid-Transit Street Ry. Co., 88 Tex. 79, 30 S.W. 533 (1895), the plaintiff sought damages because the defendant's street cars ran in front of his business every 10 to 20 minutes and interfered with traffic and the access to his business. The holding was that a general demurrer of the defendant was properly sustained; that the street was dedicated to transportation which included street cars and busses; and that the resultant injury to abutting owners was not compensable.

The governmental authorities, of course, have a duty to maintain properly the public roads, and they have the corresponding power and responsibility to enact reasonable regulations for the use of streets and roads. In the early case of

---

2. 1 Harper & James, The Law of Torts 64 (1956).

3. 1 Harper & James, The Law of Torts 69 (1956). See also Cooley on Torts (4th ed) §§ 432, 433.

4. State of Texas v. City of Austin, 160 Tex. 348, 331 S.W.2d 737 at 747 (1960).

5. Texas & P. Ry. Co. v. Rosedale Street Railway Co., 64 Tex. 80 (1885).

6. Shell Oil Co. v. Jackson County, Tex. Civ.App.1946, 193 S.W.2d 268 (no writ).

Taylor v. Dunn, 80 Tex. 652, 666, 16 S.W. 732 (1891), the defendant insisted on his right to build a railroad track down a street in the City of Austin to deliver materials for the erection of the state capitol building. It was held that unlike street cars, this was such an unreasonable use of a city street as to require permission from the city. In passing, the court wrote that,

> "Necessity may, and frequently does, justify the use of a street or streets for the purpose of transporting things in an unusual manner, or for the purpose of transporting such things as necessarily obstruct a street for the time; but such uses are not necessarily illegal, for streets as passways must frequently be subjected to uses strictly in the line of the purposes for which they exist, but unusual because of the nature of the things to be transported, or of the vehicles necessary to their transportation." 16 S.W. at 736.

More modern cases involving the case of freeways are illustrated by Lombardy v. Peter Kiewit Sons' Co., 266 Cal.App.2d 599, 72 Cal.Rptr. 240 (1968). There people living next to a freeway sued the State and the contractor who erected the freeway for damages on the ground that the freeway constituted a nuisance because of noise, fumes, dust ladened air, and vibrations of the land caused by the heavy traffic. The court recognized that the roar of automobiles and trucks, as well as fumes, dust and other matters, were a source of irritation as well as physical distress; and that all of this constituted a loss of peace and quiet which our forefathers enjoyed before the invention of the gas engine. But the holding was that the plaintiffs failed to state a cause of action upon which recovery could be had; that all of the above are suffered in varying degrees by householders who live in the vicinity of freeways, highways, and city streets.

The cases mainly relied upon by plaintiffs and chiefly cited by the court of civil appeals in this case lie somewhere in between the two lines of cases cited above.

In Collins Construction Co. v. Tindall, 386 S.W.2d 218 (Tex.Civ.App.1965, writ ref'd. n. r. e.), Collins was employed by the Texas Highway Department to furnish crushed stone for highway construction. Collins instituted a rock crushing operation on private land near the highway right-of-way but not upon it. It was also near the plaintiff's house, and the dust from the operation offended the plaintiff. The jury found that Collins did not operate the rock crushing facilities in a reasonable manner, and Collins was held liable under the carbon black cases of King v. Columbian Carbon Co. and Columbian Carbon Co. v. Tholen, discussed above. By denying the writ of error in the Collins case, this court approved the holding that the deliberate operation for profit upon private land which caused damages to the nearby plaintiffs did come within the carbon black cases.

The other case relied upon by the plaintiffs and cited by the court of civil appeals is Shannon v. Missouri Valley Limestone Co., 255 Iowa 528, 122 N.W.2d 278 (1963). There the defendant limestone company operated a large quarry some three miles from a paved road. The three-mile stretch of road in between was unpaved and surfaced with limestone. Trucks contracting with the limestone company to deliver crushed rock virtually took over the three miles of road, making 450 to 750 trips per day. The dust was not only from the road but from the uncovered loads of rock being hauled. The dust was so bad that drivers had to use their headlights in the daytime. It was a permanent operation. The suit was by householders along the three-mile road for an injunction against the company, the county, and the truck drivers. The trial court required the county and the company to treat the surface of the road, or be enjoined from hauling the rock. The drivers were required to cover their loads and directed to not follow each other closer than 300 feet. This holding was affirmed as to the appealing limestone company.

We regard the above limestone case as falling within those classified by Harper &

James, discussed above, as involving "more or less continuous interference with the use and enjoyment of property" by an industry, and where, as reasoned by Prosser, the question is not the defendant's original conduct, but whether he will be permitted to continue it.[7]

While of course it is a matter of degree, the number of trips by the trucks in the above limestone case was 450 to 750 *per day;* and there was no evidence that the situation would change. The total number of hauls over a four months' period in our case was 825, together with their return trips, and the trips per day varied from zero to 20. The Iowa Supreme Court in the limestone case, supra, itself distinguished the facts of the case at bar by saying, "This is not a situation where the trucks are merely hauling to a particular site for use, but is continual during the entire working season." Moreover the trucks themselves gave off dust from their uncovered loads of limestone rock, whereas the trucks in the case before us formed no part of the irritation except that they traveled over the gravel road.

It is unnecessary for us to hold, and we do not hold, that the use for profit of a public highway cannot be, or become, a nuisance. The limestone case cited just above is a strong case for the holding that it may be. We do not, however, regard the facts in the case before us as warranting a holding of liability without fault, or nuisance without fault (there being no unlawful, malicious or negligent conduct) where the activity is of a temporary nature and simply involves the lawful use of a public road to deliver pipe for a public water supply project. We hold as a matter of law that the conduct of the defendant here was not such to give rise to a cause of action for damages.

The judgments of the courts below are reversed, and judgment is here rendered that the plaintiffs take nothing.

7. Prosser, Nuisance Without Fault, 20 Tex.Law Rev. 399 at 418 (1942).