### EX PARTE I. W. SULLIVAN.

No. 3506.   Decided May 5, 1915.

Rehearing denied June 9, 1915.

**1.—City Charter and Ordinance—Jitneys—Motor Buses.**

Under a special Act of the Legislature the City of Fort Worth has charter powers to pass an ordinance regulating motor buses, commonly called "jitneys," and exact a payment of a license fee for operating said vehicles and procuring an indemnity contract from some solvent insurance company, and require other reasonable regulations therefor. Following Ex parte Gregory, 20 Texas Crim. App., 210, and other cases. Davidson, Judge, dissenting.

**2.—Same—Case Stated—Jitneys—City Ordinance.**

Where relator was arrested for violating an ordinance defining a motor bus for hire and providing that it shall be necessary to take out a special license for the operation of the same, and the provisions under which said special license may be issued and regulating the running of said motor buses within the city limits of said City of Fort Worth and providing a penalty for the unlawful operation thereof and declaring the unrestricted operation of said motor buses to be a nuisance and unlawful. Held, that said ordinance is valid, and the violation thereof being admitted, that the relator be remanded to custody. Davidson, Judge, dissenting.

**3.—Same—Police Powers—Validity of Ordinance.**

Under the charter provisions of the City of Fort Worth, said city has the power and authority to enact and enforce proper ordinances prescribing

reasonable regulations for the use and operation within said city limits of public motor buses or "jitneys," where the agreed facts showed that from the traffic conditions and large number of accidents from the operation of said buses and "jitneys," the commissioners of said city deemed that there was an imperative and urgent necessity for the passage and enactment of said ordinance, and said ordinance is reasonable and valid. Davidson, Judge, dissenting.

### 4.—Same—Rule Stated—Construction of Ordinance.

The courts will give city ordinances a reasonable construction, and will incline to sustain, rather than to overthrow them, and especially is this so where the question depends upon their being reasonable or otherwise, and where the Legislature has conferred full and complete jurisdiction on a municipal corporation over a certain subject, the acts of the corporation will be supported by every fair intendment and presumption.

### 5.—Same—Presumption in Favor of Ordinance.

It must be presumed that, in framing and enacting a city ordinance, the commissioners acted with the knowledge of the Constitution, the charter and decisions and intended to conform the ordinance to the requirements thereof, so as to make it a valid and effective ordinance.

### 6.—Same—Rule Stated—Reasonable Ordinance.

The courts are not authorized to declare an ordinance unreasonable and void unless its unreasonableness shall clearly appear. Following Ex parte Battis, 40 Texas Crim. Rep., 112, and other cases.

### 7.—Same—Occupation Tax—License Fee.

Where the agreed facts exclude the idea that said amount is levied as an occupation tax, but on the contrary establishes clearly that it was what it purports to be, a license fee only, the contention that it was an occupation tax is untenable, and this, although the relator had procured a license receipt under another ordinance which was headed, "City Occupation Tax"; this was simply an old blank, and was not prepared under the new ordinance requiring a license fee. Following Ex parte Denny, 59 Texas Crim. Rep., 579, and other cases. Davidson, Judge, dissenting.

### 8.—Same—License Fee—Passenger Capacity.

Where the agreed facts showed that relator came within the ten dollar license fee class only, his objection to the ordinance in fixing a higher fee for greater seating capacity is untenable, as it did not injuriously affect the relator.

### 9.—Same—Case Stated—Former License.

Where relator contended that he was entitled to operate his "jitney" under the new city ordinance upon a receipt for license entitling him to run his "jitney" under a former ordinance, which was amended and changed by the new ordinance; this was no defense.

### 10.—Same—Class Legislation—Discrimination—Indemnity Contract.

Where relator was arrested for violating a city ordinance regulating the operation of "jitneys" within the City of Fort Worth, his contention that said city had no power or authority to require him to procure, pay the premium upon and deliver to the city an insurance policy or indemnity contract, as described in said ordinance, and to require the operators of "jitneys" to do this when it does not require the other carriers of passengers within said city to do so is an unlawful discrimination against them, is untenable, and such regulation is reasonable and valid. Following Hirshfield v. Dallas, 29 Texas Crim. App., 242. Davidson, Judge, dissenting.

### 11.—Same—Discrimination—Classification.

Where the city charter expressly gave the city the exclusive power and control over its streets and to in any and every reasonable way regulate the use thereof by all character of vehicles carrying passengers for hire, and

others, and it had before the advent of the "jitney" only two classes of public carriers; towit, the street car company and the ordinary hacks and automobiles of the city, for which regulating ordinances were enacted, it had full power and authority to act upon the new condition and regulate the operation of the "jitneys" within said city limits when it became necessary to do so, and to require said "jitneys," among other things, to give an indemnity contract for the protection of persons other than the passengers of the "jitneys," which enured as well to the benefit of the operator as to the persons injured, and this although no such indemnity contract was required from the other public carriers. Following Galveston v. Posnainsky, 62 Texas, 118. Davidson, Judge, dissenting.

### 12.—Same—Indemnity Contract—Municipal Powers.

While a municipal corporation can not legalize a nuisance, it has power to control the use of streets for a lawful purpose, and as it may become liable for the improper use or condition of streets while occupied by persons permitted to use them for a proper, but unusual purpose, which may be attended with inconvenience or even danger, it may require indemnity from such persons on which to rely in case cause of action results against it from such persons' act or omission. Following Taylor v. Dunn, 80 Texas, 652. Davidson, Judge, dissenting.

### 13.—Same—Reasonable Regulation—Jitneys.

Everyone knows that a motor bus or "jitney" is a powerful and dangerous machine, especially when operated in crowded streets, and this court can not say, as a matter of law, that an ordinance regulating the operation of them in a crowded city which requires the "jitney" man to procure an indemnity bond or contract as a prerequisite to his running his business in the streets of the City of Fort Worth is as a matter of law so unreasonable and oppressive a regulation that it renders the provisions of said ordinance void, but on the contrary, this court holds that said ordinance under the statement of facts is reasonable and valid. Davidson, Judge, dissenting.

### 14.—Same—Classification—No Discrimination.

Where the facts as agreed to showed three separate and distinct classes of common carriers of passengers for hire in the City of Fort Worth (outside of the steam and interurban railway not under consideration); towit, first, the street car; second, the ordinary hack and automobile; and, third, the "jitney," or motor bus, there was no discrimination in the classification of these common carriers by requiring the operator of the jitneys by the ordinance under which relator was arrested to give an indemnity contract for the operation of his "jitneys," and not to require such indemnity contract from the other common carriers mentioned. Following Southwestern, etc., Co. v. City of Dallas, 174 S. W. Rep., 636, and other cases. Davidson, Judge, dissenting.

### 15.—Same—Case Stated—Not Class Legislation.

In the opinion of the majority of this court, the agreed facts in this case show such a marked distinction between the three characters of passenger carriers for hire and the extent and manner of their use of the streets, as to justify the city in requiring the operator of the "jitney" to give an indemnity bond or contract, and in not requiring either of the other classes of carriers to do so, and that, therefore, said ordinance under which relator was arrested is valid and constitutional and reasonable, and not class legislation. Davidson, Judge, dissenting.

### 16.—Same—Indemnity Contract—Insurance Company.

The contention of the relator that it is unreasonable and oppressive to require him to take out the indemnity insurance from some company designated by the ordinance, and that instead he should be permitted to give personal sureties, if he so desired, is untenable, where the agreed statement of facts showed such regulation was reasonable. Davidson, Judge, dissenting.

**17.—Same—Given Route—Designating Termini.**

The contention of relator that the provisions of the ordinance require him to select a given route over which he will run his motor bus or "jitney" designating the termini and requiring him to adhere to that route, etc., is unreasonable, cannot be upheld.

**18.—Same—Common Carriers—Reasonable Regulation.**

Common carriers subject themselves to all reasonable regulations by city ordinances, and where the city did not undertake to fix the route and termini of the "jitneys," but with some restrictions, permits the operators of the "jitneys" themselves to make such selection, such regulation is reasonable. Davidson, Judge, dissenting.

**19.—Same—Board of Commissioners—Police Power.**

Where relator had been denied any license to operate a "jitney" within the city limits of Fort Worth, his contention that the powers of the board of commissioners under another section of the ordinance was ultra vires is untenable, as he was not affected thereby; besides, the power of the city to refuse license altogether under certain conditions is not unreasonable. Davidson, Judge, dissenting.

**20.—Same—Monopolies—City Ordinance.**

A city ordinance regulating the use and operation of motor buses or "jitneys" within the limits of the city under a special charter is not obnoxious to the Constitution or any statutory provision preventing monopolies.

**21.—Same—Case Stated—Writ of Habeas Corpus Denied.**

Where relator was convicted in the Corporation Court and County Court in the City of Fort Worth on a complaint charging him with a violation of a city ordinance regulating motor buses, commonly called "jitneys," in that he failed to pay the license fee required for operating said vehicles, and that he operated it without first procuring an indemnity contract from some solvent insurance company, he is not entitled to the writ of habeas corpus nor a discharge thereunder, and his application is refused and he is hereby remanded to the custody of the proper officer. Davidson, Judge, dissenting.

From Tarrant County.

Original habeas corpus proceeding asking writ of habeas corpus and discharge of relator under a conviction in the Corporation Court and County Court under city ordinance of the City of Fort Worth; penalty, a fine of $10.

The opinion states the case.

*C. E. Farmer* and *H. D. Payne,* for relator.—On question of unconstitutionality and invalidity of ordinance: Dilworth v. State, 36 Texas Crim. Rep., 189; Ex parte Terrell, 40 Texas Crim. Rep., 28; Owens v. State, 53 id., 105; Ex parte Woods, 52 id., 575; Seattle v. Dencker, 137 Am. St. Rep., 1076; State v. Parr, 134 Am. St. Rep., 759; Hager v. Walker, 129 Am. St. Rep., 238.

On question of occupation tax and class legislation: Pullman Palace Car Co. v. State, 64 Texas, 274; Soon Hing v. Crowley, 113 U. S., 703; Ex parte Jones v. State, 38 Texas Crim. Rep., 482, and cases cited in minority opinion.

*C. C. McDonald,* Assistant Attorney General, and *Marshall Spoonts,* County Attorney, *H. C. McCart,* Corporation Counsel of the City of

Fort Worth, and *C. R. Bowlin* and *S. L. Samuels,* for the State.— Cited cases in majority opinion.

PRENDERGAST, PRESIDING JUDGE.—This is an application by Mr. Sullivan for a writ of habeas corpus and discharge thereunder.

He shows that he was convicted in the Corporation (City) Court of Fort Worth on a complaint charging that he violated ordinance No. 448 of said city regulating motor buses,—commonly, and for convenience herein, called "jitneys"—hereinafter copied, in that: (1) He failed to pay the license fee of $10 required for operating said vehicle before doing so; and, also (2) that he so operated it without first procuring an indemnity contract from some solvent insurance company; that he was fined $10 in the Corporation Court; that he appealed therefrom to the County Court, where he was again fined $10, from which no appeal lies. He was held in custody by the sheriff, under a proper commitment under said conviction.

He attacks said ordinance as unconstitutional and void for many reasons.

The application is before us on agreed facts. In order to properly discuss the material questions, it will be necessary to state, more or less, the charter provisions of the city, the ordinance attacked and others bearing on the subject, and the agreed facts.

The charter of the City of Fort Worth is a special Act of the Legislature approved and in effect March 10, 1909 (Special Laws, p. 227), and was incorporated as a city of more than 10,000 inhabitants, with the commission form of government. It was stated and agreed orally when the case was submitted, that the city now has a population of about 100,000. The Act prescribes it shall be taken and held a public law, and requires that all courts shall take judicial knowledge of the contents and provisions thereof. (p. 287.)

The charter says: The governing body of the city shall consist of a board of commissioners, composed of a mayor and five commissioners.

Among others, are these charter provisions: "The board of commissioners of said city shall be vested with the power, and charged with the duty, of making all laws or ordinances not inconsistent with the Constitution of the State, touching every object, matter and subject within the local government instituted by this act." (p. 238.)

"The board of commissioners shall have the power to pass, amend or repeal all ordinances, rules and police regulations not contrary to the laws and Constitution of this State, for the good government, peace and order of the city and the trade and commerce thereof that may be necessary or proper to carry into effect the powers vested by this charter in the corporation, the city government or any department or officer thereof; to enforce the observance of all such rules, ordinances and police regulations and to punish violations thereof by fines, penalties and costs; but no fine or penalty shall exceed two hundred ($200) dollars." (p. 281.)

"Said City of Fort Worth shall have the power: . . . To enact

and enforce ordinances necessary to protect health, life and property, and to prevent and summarily abate and remove nuisances of all kinds and descriptions, and to preserve and enforce the good government, order and security of said city and of its inhabitants, and have and enjoy general police powers of a city; and the enumeration of other powers elsewhere herein and the specifications of same shall not be regarded as limitations upon the general powers herein conferred upon the city by this section." (p. 276.)

"The board of commissioners shall have power to lay out, establish, open, alter, widen, lower, extend, grade, narrow, care for, pave, supervise, maintain and improve streets, alleys, sidewalks, squares, parks, public places, and bridges, shall have the exclusive power and control over the same, and shall have the power to vacate and close the same; . . . and to prevent the encumbrance thereof in any manner, and to protect the same from any encroachment or injury, . . . and to abate and punish any obstructions and encroachments thereof. . . . To prevent the encumbering of the streets, alleys, sidewalks, and the public grounds with carriages, wagons, carts, hacks, buggies or any vehicle whatever." (pp. 246-7.)

Section 2, chapter IV, page 248, provides the commissioners shall have power by ordinance or otherwise, to regulate, within the city, the speed of locomotives, trains, street cars, vehicles and animals. To require street, electric, and steam railway companies to maintain, in good repair, and properly drain that part of the area of the streets occupied by them and to construct and keep in good repair, bridges, crossings and culverts over and upon all drains or ditches on streets occupied by them. To require such companies to grade and pave and keep in good repair with the same material with which the remainder of the street is paved, the width of their tracks and between them, their switches and turnouts, and a reasonable distance outside and next to the rails of said tracks, not to exceed 18 inches.

Section 8, page 276, provides: "The board of commissioners shall have power by an assessment of taxes for said purpose or otherwise, to require any street or electric railway company . . . to bear its reasonable share of the expense of sprinkling or sweeping such portions of any street or alley as are traversed by its lines. The board of commissioners shall have power to compel all street railway companies to supply ample accommodations for the safe and convenient travel of the people on the streets where their tracks may run in the vicinity thereof, and to compel said railway companies to furnish ample, safe, comfortable and convenient cars for transportation of passengers and to make such other regulations as may by them be deemed necessary for the safety, convenience and health of the public in the running of street cars."

Section 15, chapter IX, page 279, gives the city power and authority: "To provide for license fees, police tax and surveillance, and generally to regulate hackmen, draymen, omnibus drivers, baggage wagon drivers, and drivers and owners of vehicles of every kind following a public

vocation or lending their vehicles for such purpose, and all others pursuing like occupations, with or without vehicles, and to prescribe their compensation, and to make it a misdemeanor for any person to attempt to defraud them of any legal charge for services rendered, and to provide and regulate public stands for vehicles and to prohibit the standing of such vehicles or horses at other than such places, and to regulate and provide a police tax and to license and restrain runners and drummers for railroad vehicles of any kind to hotels, public houses, or any other places whether of like or unlike kind."

Section 19, page 258, gives the city power to levy one-half what the State does on every occupation, etc.; and provides "that nothing herein shall be construed to prevent the city, in the use of its police power, from prescribing license fees, or police tax, necessary and proper, to enable the city to exercise proper police surveillance over all persons, firms or corporations, or calling, subject to same."

Under proper power, authority and duty, in 1908, the city duly passed ordinance No. 65. Its caption in a general way states its objects. It is:

"An ordinance providing for the licensing of carriages, hacks, omnibuses, automobiles, and other like public vehicles operated for hire within the City of Fort Worth, prescribing the rate of charges that shall be made by the owners or custodians thereof for the transportation of passengers, and making it the duty of the person conducting or operating such vehicle to keep the said rate of charges conspicuously posted upon or about such vehicle, and providing a penalty to charge or collect fares in excess of said rate of charges, and prescribing a penalty against any person who shall fraudulently obtain conveyance on such vehicle and fail or refuse to pay therefor."

This ordinance made no mention of street car companies and did not undertake to regulate street cars.

On July 11, 1914, the city passed an ordinance, No. 421, and one week later passed another, No. 422, amending and substituting certain sections of 421, the two together, in effect, making one ordinance. The caption of that ordinance is:

"An ordinance to regulate the use of the public streets and highways of the City of Fort Worth by horses, mules, street cars, vehicles of all kinds and pedestrians, establishing regulations as to the transportation of merchandise and other property over and upon such streets and highways, and for the movement, stopping and standing of street cars, pedestrians and vehicles of all kinds in the streets, highways and other public places, and repealing all ordinances and parts of ordinances in conflict herewith and fixing penalties for the violation hereof."

This ordinance is quite comprehensive, undertaking to regulate, and minutely regulating, the use of all such vehicles and persons operating them, and the streets by them, as was necessary and proper under the facts and conditions of things as they then existed in said city, specially naming automobiles as included therein. As we understand, none of the provisions of said ordinances, 65 or 421-2, are attacked by the

applicant. On February 15, 1915, the city amended section 1 of said ordinance 65, so that that section was then made to read as follows:

"Section 1. That hereafter all persons operating carriages, hacks, omnibuses, automobiles or other vehicles within the City of Fort Worth, for the purpose of carrying passengers for hire, shall first obtain a permit from the board of city commissioners in writing therefor, stating in such application the name, street address, age of the operator, period of experience of such operator in the operation of public vehicles, the character of business engaged in by such applicant, whether such person is addicted to the use of intoxicating liquors or the use of morphine, cocaine or opium or any other drug calculated to affect the physical strength or mind of the operator, and shall also state whether such applicant is deaf or partially deaf, or is nearsighted, or is laboring under any other physical infirmity or afflicted with any disease of any kind, and that said application shall also state whether the said applicant has ever been convicted of any violation of the traffic ordinance of the City of Fort Worth, and shall also state the place of residence of the applicant for a period of at least five years prior to the date of. making such application, and the character of business engaged in by such applicant.

"That if the board of city commissioners are satisfied with the application, they shall order the assessor and collector of taxes to issue a permit to the person applying therefor, and such person shall be entitled to said permit or license for the period of twelve months upon paying to the assessor and collector of taxes the amount of three ($3.00) dollars for each carriage, hack, omnibus, automobile or other vehicle used by him; provided, however, that said board of city commissioners shall in no event be compelled to order the issuance of any license within less than ten days after the presentation of the application therefor to said board; provided, it shall not be lawful to operate, under the license hereinabove provided for, any motor bus, as the same is defined in ordinance No. 448, passed by the board of city commissioners of the City of Fort Worth on the 15th day of February, A. D. 1915."

While this is section 1 of ordinance 65, we understand that it was intended to apply, and does apply, to all persons or drivers of all motor buses or "jitneys," as well as to all the other vehicles mentioned. We do not understand that the applicant in any way attacks said amended section 1.

The other provisions of said ordinance 65 and of ordinances 421-2 are numerous and quite lengthy. We deem it unnecessary to here quote any of them. They in no way require the street car companies to take out any license or insurance whatever to run and operate street cars; nor do they require the operators of any of the other vehicles to procure any insurance or indemnity as a prerequisite to operating any such vehicle. They are silent as to these matters.

Thus matters stood until the advent of the "jitneys," which occurred in January, 1915. Their advent and operation created a state of fact

entirely different from what had existed theretofore. This necessitated, as the city deemed it, the passage of an ordinance to specially regulate them, which resulted in the passage of ordinance 448 on February 15, 1915.

We now copy the caption and said ordinance 448 and the agreed facts pertaining thereto:

"Ordinance 448. An ordinance defining a 'motor bus'; providing that it shall be necessary to take out a special license for the operation of the same and the provisions under which a special license may be issued; regulating the running of motor buses within the city limits of the City of Fort Worth; providing a penalty for the unlawful operation thereof, and declaring the unrestricted operation of said motor buses to be a nuisance and unlawful.

"Section 1. Unless it appears from the context that a different meaning is intended, the following words shall have the meaning attached to them by this section:

"(a) The word 'street' shall mean and include any street, alley, avenue, lane, public place or highway within the city limits of the City of Fort Worth.

"(b) The words 'motor bus' shall mean and include any automobile, automobile truck or truckless motor vehicle engaged in the business of carrying passengers for hire within the city limits of the City of Fort Worth, which is held out or announced by signs, voice, writing, device or advertisement to operate or run, or which is intended to be operated or run, over a particular street or route or to any particular or designated point, or between particular points, or to or within any designated territory, district or zone.

"(c) The word 'person' shall include both singular and plural, and shall mean and embrace any person, firm, corporation, association, partnership or society.

"Section 2. No person shall run or operate or cause to be run or operated a motor bus within the city limits of the City of Fort Worth without first obtaining a license therefor; and no license certificate shall be issued until and unless the person so desiring to operate such motor bus shall file with the city secretary of the City of Fort Worth an application in writing for a license; which said application shall state: (a) The type of motor car to be used as such motor bus. (b) The horse power thereof. (c) The factory number thereof. (d) The county license number thereof. (e) The seating capacity thereof, according to its trade rating. If the motor car has been adopted for use as a bus, either by converting a freight carrying truck into a passenger carrying vehicle, or by reconstruction modifying or adding to the body or seating arrangements of a passenger carrying motor car, a statement of its seating capacity shall be added. (f) The name and age of each of the persons to be in immediate charge thereof as driver. (g) The termini between which each motor bus is to be operated and the street or streets over which such motor bus is to be run, both going and returning.

"The city secretary of Fort Worth shall refer such application to the board of city commissioners of the City of Fort Worth, at its next regular meeting, occurring not less than thirty-six hours after such filing, together with the recommendations thereon. The commission may grant such application for license as filed, or grant the same in modified form, or if any such person designated in subdivision (f) of this section be not qualified as to age, experience or otherwise, to be in the opinion of the commissioners an unfit person to operate such motor bus, or if the motor car described in the operation of the particular motor bus or motor buses over the route designated by reason of existing traffic conditions would be dangerous or hazardous to public safety, or if said application be not in compliance with the provisions of this ordinance, the board of commissioners may refuse same.

"Upon the granting of such application as filed or modified, and the payment of the required license fee, and the filing with him of the indemnity contract herein provided for, properly approved by the commissioner of fire and police, the city assessor and collector shall issue a certificate of license to operate, or cause to be operated the motor bus described, between the termini stated, and between no other termini, provided that the termini stated in such certificate may thereafter be altered by order of the board of city commissioners of the City of Fort Worth in its discretion, upon the application of the person holding such license, for which change a fee of fifty cents shall be charged and collected.

"Section 3. The license fees herein provided for are fixed as follows:

"For each motor bus with a seating capacity of five (5) or less persons, including the driver, $10.00 per year; for each motor bus with a seating capacity of seven (7) or less but more than five (5) persons, including the driver, $20.00 per year; for each motor bus capable of seating more than (7) persons, including the driver, $30.00 per year.

"Section 4. The license herein provided for shall be good and in force and effect only for the calendar year in which same are issued. If a license be issued covering a period of less than one-half calendar year, then the fee for same shall be only half the fee provided herein. License for succeeding years shall be procured and license fees paid before expiration of current year, but the owners of all auto buses now being operated shall have ten days after the taking effect of the ordinance to procure license and indemnity contract as hereinafter provided, and to comply with the further provisions of this ordinance.

"Section 5. It shall be unlawful

"(a) To drive or operate or cause to be driven or operated any motor bus upon or along any street unless there is in force and effect a valid license as prescribed in this ordinance for the operation of such motor bus.

"(b) To stop any motor bus, or to permit such motor bus to remain standing upon any street for the purpose of loading or unloading pas-

sengers, except same be brought as near as possible to the right hand curb of said street.

"(c)   To drive or operate motor bus without the city license number thereof displayed in figures not less than three inches in height permanently painted or attached to the body or appurtenances of the body on both the front and rear of said motor bus, and on the rear painted the word 'bus.'

"(d)   To drive or operate any motor bus without having permanently displayed upon same and permanently attached to same a sign or painting showing both the destination and the route of same in accordance with the provisions of the license covering same.

"(e)   To drive or operate any motor bus while any person is standing or sitting upon any running board or fender thereof, or while any person is riding on such motor bus outside the body thereof. It shall also be unlawful for any person to stand or sit upon any fender or running board of any motor bus, or occupy any portion of such motor bus outside the body thereof while such motor bus is in operation; or for more than one passenger to ride in the front seat.

"(f)   To drive or operate a motor bus upon any street in the City of Fort Worth unless and until the owner thereof or the person in whose name the license or permit is sought or issued shall have procured and deposited with the city assessor and collector of the City of Fort Worth, with receipt showing premium on same to have been paid, a liability contract written by some solvent insurance corporation incorporated under the laws of the State of Texas, or with permit to do business in this State, agreeing to indemnify the legal liability of said owner or licensee of said motor bus on account of personal injury, in the sum of five thousand ($5000.00) dollars to any one person, other than a passenger on said motor bus, and ten thousand ($10,000.00) dollars for any single accident where more than one person, other than a passenger on said motor bus, is injured or killed, and one thousand ($1000.00) dollars on account of property damage to anyone other than a passenger on said motor bus, accruing on account of the operation of said motor bus, in any street of the City of Fort Worth. And in the event said policy of insurance should for any reason be canceled or retired, it shall be unlawful to continue the operation of said motor bus until another such bond shall have been procured and deposited with the city assessor and collector as aforesaid. Before filing of any such insurance contract it shall first be presented to and approved by the board of city commissioners of the City of Fort Worth.

"(g)   To fail, refuse or neglect to operate a motor bus between the termini designated in the license for a period of not less than twelve consecutive hours out of every twenty-four (24) hours, except on Sundays, and a reasonable time for going to and from meals, and in case of accidents, breakdowns or other casualties, or upon the surrender of said license; or to operate, or permit to be operated, any motor bus off of, or away from, the route stated and fixed in the license for the operation of such bus, except in case of emergency.

"(h)  To race with any other auto bus or drive rapidly to pass one in order to be first to any prospective passenger or to anyone waiting for motor bus or other conveyance.

"(i)  To operate any motor bus at a greater rate of speed than twelve miles per hour in the business section of the City of Fort Worth, or eighteen miles per hour in the residence section thereof.

"(j)  To reconstruct, materially alter, modify or add to the body or seating arrangements of any motor bus, after the license thereof is issued without first applying for and receiving the consent of the commission.

"(k)  To run any motor bus, with the top up, between sundown and sunup, unless the same is equipped with a light or lights which shall be kept burning so as to well light both the front and rear seats of said bus.

"Section 6.  In the operation and driving of any motor bus, the same shall be stopped for the loading and discharging of passengers only at the near side of the streets intersecting the street on which the motor bus is being operated and only on the right hand side of the street, on which the motor bus is being operated.  Said motor bus shall not be stopped in such position as would interfere with the use of the cross-walks crossing such streets, or as to interfere with or access to or from other conveyances in such street.

"Section 7.  Any person who shall violate any provision of this ordinance shall be guilty of misdemeanor, and upon conviction thereof, shall be punished by a fine not exceeding two hundred dollars.

"Section 8.  In case of the conviction of the owner or operator of any motor bus, of the violation of the terms of this ordinance, it shall be the duty of the commissioner of fire and police to report such conviction to the board of city commissioners, together with his recommendation.  The commission shall consider and act upon said recommendation and may revoke, suspend or continue in force such license as it may deem proper.

"Section 9.  Any person holding a license to operate a public automobile in the City of Fort Worth at the time this ordinance takes effect may surrender the same and shall thereupon be entitled to credit for the value of the unexpired portion thereof, prorated according to the time, in payment of a license fee hereunder.  Any person operating a motor bus, as defined herein prior to the introduction of this ordinance, under a public automobile license, who shall file an affidavit stating that he has elected to retire from such business because of the adoption of this ordinance, shall be entitled to a refund of the value of his unexpired license prorated according to time; provided, that said affidavit shall be made within fifteen (15) days after this ordinance goes into effect.

"Section 10.  The holding or adjudication of any section or subdivision of any section of this ordinance to be invalid shall not effect the validity of any other section or subdivision of a section, but all

other sections and subdivisions of sections shall be and remain in full force and effect.

"Section 11.   The operation of any motor bus otherwise than as provided in this ordinance is hereby declared a nuisance and menace to public safety, and unlawful.

"Section 12.   Each and every day's violation of this ordinance shall constitute a separate offense.

"Section 13.   All ordinances and parts of ordinances in conflict with this ordinance shall be, and the same are hereby repealed, in so far as in conflict and no further.

"Section 15.   This ordinance shall be in force and effect, except as herein otherwise provided from and after its passage and publication."

Said agreed facts are as follows:

"21.—It is agreed that there is a street car system in the City of Fort Worth which carries passengers for a fare of five cents, which system is operated under a franchise from the City of Fort Worth, and said street car system or corporation is not required by ordinance to take out a license for the operation of their cars, and operate their cars over various streets, taking a car from one route to another, at will, changing the sign thereon, but in so doing do not abandon service on any route from which such car is shifted, but keep sufficient cars on such route for the accommodation of the traffic and run from 5:30 a. m. to 12:40 a. m. continuously each day, including Sundays.

"22.   It is agreed that vehicles under ordinance No. 449 have the use of all streets, have designated stands and run only on special calls, and are not held out as running over any particular route, and charge a higher rate of fare than the motor bus.

"24.   It is agreed that the copy of the bond hereto attached and marked 'Exhibit E,' is a substantial copy of some bonds approved by the city officials.   That while the officials have approved the above form of bond, the city does not require any other conditions of the bond than those stated in ordinance No. 448.

"25.   That the premium charged by the insurance companies for the required bond is sixty ($60.00) dollars, covering a period of one year.

"26.   It is agreed that there are now licensed and in operation, practically 300 automobiles or motor buses running and operating over the streets of the City of Fort Worth, and hauling passengers to and from different points for a fare of five cents, and are generally known as jitneys, or motor buses; that of these 300 jitneys, or motor buses, some twenty-five or thirty have complied with ordinance No. 448, which ordinance seeks to regulate the running and operation of said motor vehicles; that the above referred to cars carry signs thereon in conspicuous places advertising to the public that they run over a particular street or particular streets or to and from particular points within the limits of the City of Fort Worth; that these 300 cars come in and out of the business section of the City of Fort Worth on each round trip that they make, and each car makes a round trip on an average of each thirty minutes; that in going into the business section of the city these cars all traverse

Main or Houston Street, the two principal business streets of the city; that on these two streets, which extend between the courthouse and Texas & Pacific depot, are laid two street car tracks in each street; that when automobiles, wagons or other conveyances are standing along the curb of these streets there only is left sufficient room for one conveyance to pass between the street car and such conveyances standing along the curb; that the running and operation of these jitneys or motor buses has greatly congested the traffic conditions upon said Main and Houston Streets and other streets within the City of Fort Worth; that the congestion occasioned by the operation of these jitneys or motor buses has necessitated the placing of additional traffic policemen at five different places, or street intersections, within the City of Fort Worth; that in the past sixty or seventy-five days there has been approximately one hundred individual accidents, in which these jitneys or motor buses have been concerned and in which one or more persons have been injured, and some have lost their lives; that traffic conditions arising by reason of the operation of jitney and motor buses have necessitated and will necessitate the employment by the City of Fort Worth of several additional motorcycle policemen for the purpose of patrolling the different streets of the city enforcing an observance of the city regulations by these jitney or motor bus operators; that since the beginning of the operation of these jitney or motor buses and the passage of ordinance No. 448, it has become necessary for the City of Fort Worth to create the office of permit clerk, and install therein a man for the purpose of issuing permits and keeping proper records thereof; that said permit clerk is paid a salary of $100 per month; that in addition to these expenses the City of Fort Worth will have to procure proper stationery in issuing the permits, and proper ledgers and journals and account books, the expense of which can not now be determined; that all extra policemen required by reason of the operation of these jitneys or motor buses and the traffic conditions arising therefrom will cost the city an average of $80 per month for each policeman hired; that said 300 jitneys or motor buses operate an average of fifteen hours each day, an average covering fifteen miles each hour, that all these cars are operated upon the paved streets only.

"27. It is further agreed that the City of Fort Worth, in the taking and approval of different characters of bond, both in the municipal court and in contracts for public work and bonds in other matters, has had a great deal of trouble with personal bonds, that by reason of unsatisfactory experience with personal surety bonds the city has for a number of years been requiring surety company bonds, and for such reasons required surety company bond in ordinance 448; that the bond required by ordinance No. 448 has been made by some twenty or more operators of jitney or motor buses, and a license taken out by said jitney or motor bus cars and their route selected and designated as required by ordinance No. 448.

"28. It is further agreed that the license receipt or certificate issued to relator herein and attached to the application for the writ of habeas

corpus as an exhibit and being headed at the top, 'Occupation Tax Receipt,' was issued by the city on old blanks which they had on hand and that the receipts were not printed or prepared expressly for use under ordinance No. 448.

"29. It is agreed that the board of commissioners of the City of Fort Worth, in view of the traffic conditions hereinbefore referred to, and the large number of accidents occurring from the operation of said jitneys, deemed that there was an imperative and urgent necessity for the passage and enactment of said ordinance 448. .

"30. It is agreed that under charter power the street railways of the City of Fort Worth are required to keep their roadbeds in repair between the tracks and for eighteen inches on the outside of either rail and that they are required to pave the street between rails and eighteen inches on the outside of each rail and that they are subject to be assessed for such paving and the cost of same made a lien against the roadbed, franchise, etc., of the street railway company and also a personal liability of the company, and that said street railway company comply with these requirements of the charter and board of commissioners at a continual and heavy cost. That there is no ordinance levying a regulation or license tax on the street cars operated by the street railway companies in the City of Fort Worth in carrying passengers for hire on their said lines of railway in said City of Fort Worth."

The agreed facts further show that the "jitney" operated by the applicant had a seating capacity of five persons, including the driver, and under section 3 of said ordinance 448, the amount of his license tax would be $10 per year. That he refused to take out any insurance policy and to pay the $10 license fee, and refused to select his route and that he run his "jitney" for five cents a passenger per trip on any street he desired, and Main Street in particular. That he complied with ordinance 421-2 and had paid $3 for the license tax and procured a license thereunder, which was issued to him on January 14, 1915, and was for one year from that date. That the facts proven on the applicant's trial in both the Corporation and County Courts showed, beyond question, that he had violated ordinance 448 as alleged in the complaint, if a valid ordinance.

As stated, the applicant attacks the ordinance under which he was convicted and is held, claiming that it is unconstitutional and void for many reasons. We think it unnecessary to take up seriatim each of his said grounds of attack. We will take up and discuss the material and vital ones which will fully determine his rights in the premises.

There can be no doubt that the city, under the charter provisions above given, not only had the power and authority to enact and enforce proper ordinances prescribing reasonable regulations on the subjects embraced in said ordinances, but that it was its imperative duty to do so. The agreed facts show that from the traffic conditions and large number of accidents from the operation of the jitneys the commissioners of the city "deemed that there was an imperative and urgent necessity for the passage and enactment of said ordinance 448." In fact, the

applicant expressly concedes that under its charter power said city could pass and enforce all reasonable regulations. But he complains that said ordinance, in several particulars, is unreasonable, so much so as to render it void, that it is class legislation, etc. These we will now discuss.

The construction and validity of ordinances of our cities have many times been before, and considered by, this court. One of the most careful, thorough and exhaustive opinions was rendered in Ex parte Gregory, 20 Texas Crim. App., 210. That decision has never been questioned or modified, but, on the contrary, many times, and down to almost this day, cited and approved. Therein (p. 217) it is said:

"In the construction of ordinances, in considering the question of their validity, Mr. Dillon says: 'The courts will give them a reasonable construction, and will incline to sustain rather than to overthrow them, and especially is this so where the question depends upon their being reasonable or otherwise. Thus, if by one construction an ordinance will be valid, and by another void, the courts will, if possible, adopt the former.' (1 Dillon, Munic. Corp. (3d ed.), sec. 420.) 'When the Legislature has conferred full and exclusive jurisdiction on a municipal corporation over a certain subject, the acts of the corporation will be supported by every fair intendment and presumption.' (The Mayor and City Council of Baltimore v. Clunet, 23 Md., 449.) 'In view of the inartificial character of town by-laws, they are especially entitled to a reasonable construction.' (Whitlock v. West, 26 Conn., 406.) 'The strict rules by which the validity of penal statutes are to be tested are not to be applied to the by-laws or ordinances of municipal corporations. It has been well remarked that the by-laws of very few of these corporations could stand such a test. They should receive a reasonable construction, and their terms must not be strictly scrutinized for the purpose of making them void.' (The First Municipality v. Cutting, 4 La. Ann., 335; Merriam v. New Orleans, 14 id., 318.)

"It is provided in our statute that 'in all interpretations the court shall look diligently for the intention of the Legislature, keeping in view at all times the old law, the evil, and the remedy.' (Rev. Stats., art. 3138, subdiv. 6.) And our Penal Code provides that 'every law upon the subject of crime shall be construed according to the plain import of the language in which it is written, without regard to the distinction usually made between the construction of penal laws and laws upon other subjects.' (Penal Code, art. 9.) It will be perceived from the provisions of our statute above quoted, that they are in accord with the rules of construction applicable to ordinances. They contemplate a reasonable construction, that is, a construction which will give effect to the intention of the legislative power enacting the law, and in interpreting the law all reasonable intendments which help to sustain and make the law operative are to be indulged and weighed by the court."

It is further therein in effect held (p. 218): It must be presumed that in framing and enacting the ordinance the commissioners acted

with a knowledge of the Constitution, the charter and decisions, and intended to conform the ordinance to the requirements thereof, so as to make it a valid and effective ordinance. Such being the intention of those who framed and adopted the ordinance, that intention must be respected and considered in its interpretation, and every reasonable intendment must be indulged, in furtherance of the accomplishment of such intention.

The correct doctrine and, in fact, the universal doctrine in this country, and in this State is, as stated by Judge Henderson in Ex parte Vance, 42 Texas Crim. Rep., 619, p. 623: "That the courts are not authorized to declare an ordinance unreasonable and void, unless its unreasonableness shall clearly appear. Ex parte Battis, 40 Texas Crim. Rep., 112; Thomp. Corp., sec. 1021; St. Louis v. Weber, 44 Mo., 547." And as further stated by him in Ex parte Battis, 40 Texas Crim. Rep., 115: "It is held, furthermore, that the courts will be liberal in upholding an ordinance and if its reasonableness be doubtful it will not be held void. Ex parte Gregory, 20 Texas Crim. App., 210." Judge Dillon, in his work on Mun. Corp., vol. 1, sec. 591, says the presumption is that an ordinance is reasonable. Our Supreme Court, in City of Austin v. Cemetery, 87 Texas, 330, p. 338, also says that the presumption is that an ordinance is valid. Judge Dillon further says: "The person attacking it must assume the burden of affirmatively showing that as applied to him it is unreasonable, unfair, and oppressive." Our Supreme Court in said case, supra, says the same thing. These principles are so well settled and of such universal application by all the courts it is unnecessary to collate the other authorities.

The applicant attacks those provisions of ordinance 448 requiring the prepayment of a license fee of $10 per annum as applied to him, claiming that it is an occupation tax and not in truth and in fact a license fee. Of course, if it was in reality an occupation tax it would be illegal and void because said city had no power or authority to prescribe any such occupation tax. We think the agreed facts herein exclude the idea that said amount is levied as an occupation tax, but, on the contrary, establishes clearly that it was what it purports to be,— a license fee only. The charter expressly authorized the city to levy such a license fee. The ordinance purposed to do that only and to levy any occupation tax. The fact that the applicant on January 14, 1915, procured a license receipt which is headed "City Occupation Tax," is relied upon by him to show or tend to show that the said license fee fixed by said ordinance is an occupation tax. That receipt is no evidence on the point, because it was issued under a different ordinance, and a month before ordinance 448 was ever passed. Besides, the agreed facts show that that receipt was issued on old blanks which the city had on hand at that time, and that since said ordinance 448 was passed, it had not prepared or printed such receipts for use under that ordinance. The said receipt further on its face shows that it was the form of blank used by the city in issuing occupation tax license for pursuing the liquor business.

The question of whether a license fee or tax is in reality not that but an occupation tax, has been before the courts of this State, and this court, so often and the distinguishing features discussed so fully that it seems useless to again discuss it.

That the ordinance fixes $20 per annum as the license fee for a "jitney" of seating capacity of over five and not exceeding seven passengers, and $30 per annum for over seven, has nothing whatever to do with this case.   It does not in any way injuriously affect the applicant. He shows he comes within the $10 class only.   There is no showing whatever that any "jitney" within either of the $20 or $30 classes has ever applied, or ever will apply, for a license.   It will not do for courts to go out of their way to decide speculative questions, which do not and can not affect the rights of the party and case before them.   To do so would be to render obiter dicta decisions of the rankest kind. 8 Cyc., 787-9.

The ordinance held valid in the Gregory case, supra, fixed the license fee at from $2.50 to $12 per annum on the various vehicles.   The fee complained of specially in that case was $8 per annum on the old hack. This record expressly shows that the "jitney" now uses the streets constantly fifteen hours each day, making round trips each thirty minutes at fifteen miles average speed per hour, and requires the constant and extra surveillance of the city through its police department.   Thus requiring infinitely more attention and expense of the city than could possibly have been the case in Galveston in 1886 of the old hack.

The ordinance held valid by this court in Ex parte Denny, 59 Texas Crim. Rep., 580, fixed the license fee at from $5 per annum on the one-horse wagon, cart or dray to $10 on each automobile and four-wheeled two-horse vehicle.   In that ordinance no vehicle constantly run over the streets, but instead when not actually engaged in hauling, or going for, a load, each was required to stay at a stand designated by the chief of police.   The opinion does not give all these facts, but the record therein, which we have examined, does.   The rule established by all the authorities on this subject is, that the fact that the license fee "results in producing revenue, which may be paid into the treasury for the use of a particular fund, or as a part of the general fund, does not deprive the assessment of the character of a police regulation" (Brown v. Galveston, 97 Texas, 1, p. 17), that it "is not to be confined to the expense of issuing it, but that a reasonable compensation may be charged for the additional expense of municipal supervision over the particular business."   .   .   .   "In fixing upon the fee it is proper and reasonable to take into account, not only the expenses merely of direct regulation, but all the incident consequences that may be likely to subject the public to cost in consequence of the business licensed.   In some cases the incidental consequences are much the most important, and indeed are what are principally had in view when the fee is decided upon.   And all reasonable intendments must favor the fairness and justice of the fee thus fixed; it will not be held excessive unless it is manifestly something more than a fee for regulation."   Ex parte Gregory, supra, 210,

pp. 222-3, and authorities therein cited; Cooley on Taxation, pp. 408-10; Ex parte Denny, supra; Ex parte Cramer, 62 Texas Crim. Rep., 11, and authorities therein cited; Ex parte Wade, 66 Texas Crim. Rep., 181, 146 S. W. Rep., 179. We think the $10 license fee fixed and applicable to applicant, as established by the agreed facts herein, and the law, is unquestionably not an occupation tax, but a mere license fee, and is not unreasonable.

Incidental to this question, it seems, the applicant contends that his said license receipt entitles him to run his "jitney" under said ordinance 448. This license, as shown on its face, was a receipt to him for $3 and authorized him to pursue the occupation of "1 auto, for hire, No. 5119, at No. 2409 Clinton Street," within the limits of said city for the period of one year from January 14, 1915. As stated that receipt or license was issued to him under the said ordinances previous to the passage of 448, and applied to an entirely different state of facts from that provided for and prescribed in 448. It was a mere license under those previous ordinances. He, however, was not operating his "jitney" under that ordinance, but the facts show that he was operating it as forbidden under ordinance 448. If he had continued to operate under the previous ordinance, well and good, but he could not use that license to operate altogether differently under another ordinance. Besides, section 9 of ordinance 448 provides most equitably for the surrender of that license. For the unexpired portion thereof he is given a credit on the license fee prescribed in said ordinance 448 if he wants to change so as to operate thereunder; or, if he did not want to continue business under the old ordinance, he could surrender that license, and the proper pro rata refund would be made to him.

Another contention by the applicant is that said city had no power or authority to require him to procure, pay the premium upon and deliver to the city an insurance policy or indemnity contract, as described in said ordinance 448, and to require the operators of "jitneys" to do this when it does not require the other carriers of passengers within said city to do so, is an unlawful discrimination against him.

Even if the requiring of such indemnity or insurance is a new feature in the regulation of the carriers in our cities, that is not any presumption that it is not a proper, reasonable, or valid regulation as conditions now exist.

We find that the ordinance of Galveston held valid in the Gregory case, supra, required bond to be given in addition to the license tax to be paid in advance. The amount and conditions of the bond are not stated in the opinion, and the papers are not accessible to us now. Also the ordinance of Dallas passed upon in Hirshfield v. Dallas, 29 Texas Crim. App., 242, in addition to requiring the prepayment of a license fee, required a bond for $1000, "conditioned against losses to purchasers on account of tickets sold, and giving said purchaser the right to sue on said bond to recover damages in the premises." Although both these ordinances were vigorously assailed, neither was on the ground they required bond.

The charter expressly gives the City of Fort Worth the exclusive power and control over its streets, and to, in any and every reasonable way, regulate the use thereof by all character of vehicles carrying passengers for hire, and others. This in addition to the most ample and full express police power to pass and enforce all ordinances for the good government, peace and order of the city and trade and commerce thereof, and to protect the health, life and property of the city and "its inhabitants," but it is expressly "charged with the duty" of doing so.

The record makes it clear that prior to the advent of the "jitney" and exclusive of the steam railroad and interurban (which are not under consideration), there had for a long time existed in the city two classes of carriers of passengers for hire, towit: 1. The street car company, and 2, the old hack or carriage and automobile. There is no necessity for discussing the character of the street car and its operation. It is known that it could not operate on any street without first securing a franchise to do so from the city, and that is shown to have been done here. The street car can run only on the iron rails laid and maintained by it at its own expense. They, of course, can not run elsewhere. As one of the burdens of its franchise and right to operate its cars, the city compels it to maintain, keep in good repair and properly drain, all that part of the streets occupied by it at its own expense, and to construct and keep in good repair the bridges, crossings and culverts over and upon all drains, or ditches on the streets occupied by it, to grade and pave and keep in good repair with the same material with which the remainder of the street is paved the width of all of its tracks in such street and eighteen inches additional on the outside of its rails, and that this is all done at a continual and heavy cost to the street car company. That all other vehicles carrying passengers for hire, other than the "jitney" can use and have used any or all of the streets, but they have designated stands and run only on special calls and are not held out as running over any particular route, and charge a higher rate of fare than the "jitney," and that this condition of things had existed for years; that the "jitney" is a class unto itself; that they sprang up and began operations almost in a day in January; that when ordinance 448 was passed there were 300 of them operating in the city; that they carry signs in conspicuous places advertising to the public that they run over a particular street or streets to and from given points; that they come in and out of the business section of the city on each round trip, each car—"jitney"—making a round trip on an average of every thirty minutes, and run at a rate of speed averaging fifteen miles each hour and operate an average of fifteen hours each day; that in going into the business section they all traverse Main or Houston Street, the two principal business streets of the city, which extend from the courthouse to the Texas & Pacific depot; that they operate only on paved streets; that on said two main business streets two street car tracks in each is laid; that when automobiles, wagons or other conveyances are standing along the curbs of these streets there is left only sufficient room for one conveyance to pass between the street

car and such conveyance; that the running and operation of these "jitneys" has greatly congested the traffic conditions upon said main business streets; that in sixty or seventy-five days during their operation approximately 100 individual accidents have occurred in which the "jitneys" have been concerned, and in which one or more persons have been injured and some have lost their lives; that their operations have already necessitated five additional traffic policemen at street crossings and will necessitate the employment of several additional motorcycle policemen for the purpose of patrolling the different streets and enforcing an observance of the regulations by these "jitneys."

It will be seen by all of this, and the whole agreed facts that the operation of the "jitney" has brought about a condition of things in said city that has never before existed and had not before been even contemplated. No such condition of things, or anything even approximating it, is shown to have existed in Fort Worth prior to the advent of the "jitney," or occasioned by anything else than the "jitney." It is apparent that in the operation of the street cars and all other vehicles in Fort Worth prior to the advent of the "jitney" their operation had never called for, nor required the city, in the protection of itself or its inhabitants, as a proper regulation of such carriers to require them, or any of them, to give any indemnity bond as is now required of the "jitneys."

Let us see what the indemnity policy or insurance is which the city requires of the "jitney" operator. It is, as the ordinance shows, in substance, a policy by some solvent insurance corporation incorporated under the laws of this State, or some foreign corporation with permit to do business in this State, indemnifying the "jitney" man in the total sum of $10,000 for any single accident where more than one person is injured or killed, $5000 when only one person is injured or killed, and $1000 damage done to the property of another. All these provisions for indemnity are where persons and their property other than the passengers of the "jitney" man are injured or killed. Neither the ordinance nor the policy make him liable for any damage. He would not be, unless he was to blame in inflicting the injury. If injury is caused by his negligence or fault, there is no question but what he is liable in law to the injured person for such damage whatever the amount may be. This indemnity contract then inures fully to his own benefit. If he causes such damage he ought to pay it, or be made to pay it. If he is insolvent or irresponsible so that he can not be made to respond, the more necessity there is for requiring him to provide for indemnity insurance so that the insurance company shall be required to pay it, or else prevent his operating a "jitney." In all events, as stated, it inures to his benefit. If he causes such injury or damage, by having such indemnity insurance, he would be indemnified, and the company, and not he, would ultimately have it to pay.

It is the settled law of this State, and been so, since the rendition of the opinion of Judge Stayton in City of Galveston v. Posnainsky, 62 Texas, 118, that when our municipal corporations are given such powers

and authority by its charter as was given Fort Worth by its charter, that "the law imposes the duty of faithfully exercising them, and gives an action for misfeasance or neglect in this respect to any person who may be injured by such failure of duty." (p. 128.) And he further says, that the weight of authority holding such municipal corporation "is liable for an injury resulting from its neglect to keep its streets in repair, is so overwhelmingly, that we feel constrained to hold the law so to be, and that an action lies for such an injury without its being expressly given by statute." (pp. 133-4.)

It is also well settled in our State, that where such city expressly or impliedly authorizes or permits anyone to so use or misuse, its streets as to negligently cause injury to another, not only is the party who thus causes injury liable, but the city is also liable.

In Taylor v. Dunn, 80 Texas, 652, Taylor and his associates contracted with the State to build the present Capitol building. It was necessary for them to have a railroad in some of the streets of Austin to haul the material to where the building was to be erected, and the city passed an ordinance authorizing them to construct and operate such railroad. Among other provisions, the ordinance required Taylor and associates to execute, and they did, a $10,000 bond to the city, conditioned they would at their cost, within ninety days after the completion of the Capitol, remove said railroad and all material thereof, and also all rubbish accumulated thereby. Other issues were in the case unnecessary to now mention, but, it seems, Taylor contended the city had no right to require said bond, and because thereof it was void. Chief Justice Stayton said:

"While a municipal corporation can not legalize a nuisance, it has power to control the use of streets for a lawful purpose, and as it may become liable for the improper use or condition of streets while occupied by persons permitted to use them for a proper but unusual purpose which may be attended with inconvenience or even danger, it may require indemnity from such person, on which to rely in case cause of action results against it from such person's act or omission." (pp. 667-8.)

In McQuillin on Mun. Ord., sec. 430, it is said:. "The proposition can not be denied that organized government has the inherent right to protect health, life and limb, . . . private property and legitimate use thereof, and provide generally for the safety and welfare of its people. Not only does the right exist, but this obligation is one imposed upon those clothed with the sovereign power. This duty is sacred and can not be evaded, shifted, or bartered away without violating a public trust." Again, in section 433, he says: "Crowded urban populations require numerous police regulations which would be unreasonable in rural districts or sparsely populated territory. This difference was quickly recognized, and from the first establishment of local corporations invested with civil government, the local community has been empowered to enact and enforce all sorts of such regulations which restrict, more or less, the liberty of the individual, his personal movements and the use of his property. These are absolutely essential to

life in crowded centers. From the beginning this necessity has been sanctioned by the public authorities and they have been sustained generally by the courts."

It needs the opinion of no court or judge to make it true, for everyone knows it is true, that an automobile—"jitney"—is a powerful and dangerous machine, and is especially dangerous, as usually operated in crowded streets. In running, it has no certain track, but is operated so as to dart about, hither and thither. The agreed facts show, as stated, that at the time said ordinance was passed, 300 of them were operated over two of the principal business streets each way every thirty minutes for fifteen hours continuously, at an average speed of fifteen miles per hour, and in the sixty or seventy-five days they had operated, 100 accidents, in which the "jitneys" were concerned, had occurred, and in which one or more persons were injured and some lost their lives.

The State requires liquor dealers to give bond (R. S., 7452) and authorizes anyone "aggrieved" and others, to sue thereon. In Peavy v. Goss, 90 Texas, 89, the Act of the Legislature requiring such bond was attacked because the title of the Act was "An Act to regulate the sale of spirituous" liquors, etc. It mentioned nothing about authorizing or requiring bond. The Supreme Court held the Act perfectly valid, saying:

"The subject matter of the Act is the *regulation* of the sale of intoxicating liquors. The bond that is required to be given and the remedies upon it which are provided for are matters *regulating* the traffic, are germane to the subject of the Act and come strictly within the purview of the title. The statute has but one subject, that of the regulation of the sale of liquors which produce intoxication."

The State as a matter of regulation requires ferrymen to get license from Commissioners' Courts (R. S., 7024 et seq.) and execute a bond, upon which anyone injured can sue and recover. So of pawnbrokers, factors and others.

In the case of the City of Indianola v. Gulf Ry. Co., 56 Texas, 594, the court sustained the action of said city in requiring the railway company to execute to it a $50,000 bond as liquidated damages, conditioned that the railroad would, within a given time, extend the line of its railway a certain distance beyond the city limits, and held a recovery could be had thereon if the railroad failed to comply with said condition. The State cites us to many other decisions from other jurisdictions tending to support the action of the city in requiring bonds of persons to exercise certain privileges and franchises upon its streets. As a general proposition, we think, there can be no doubt that the City of Fort Worth could annex reasonable conditions to the exercise of the privilege or franchise to the "jitneys" to operate upon its streets.

On this point, as we see it, it resolves itself into whether or not the judges of this court can say, as a matter of law, that to require of the "jitney" man to procure such a bond as a prerequisite to his running his business in the streets of Fort Worth, is so unreasonable and oppres-

sive as a regulation of the business as to render that provision of the ordinance void.

We have no knowledge on the subject other than is disclosed by the facts and record in this case, and the knowledge that we are presumed to possess in common with all other men. On the other hand, the City of Fort Worth and its governing commissioners must have knowledge and we must presume they have, which we can not have. They are on the ground and have for years had observation and experience about such matters, and daily, if not hourly, must see the effects of the operation of the "jitney" as well as the other common carriers of passengers for hire on its streets. As stated, the agreed facts are that the board of commissioners, in view of the traffic conditions, and the large number of accidents occurring from the operation of said "jitney," deemed that there was an imperative and urgent necessity for the passage and enforcement of said ordinance 448. From a full consideration of the principles of law applicable, and the facts shown in this case, we can not say that the city had no power or authority and that there was no necessity for requiring the said indemnity bond, as a proper regulation of the business, and we can not pronounce that feature of the ordinance void.

We have had much difficulty in reaching a correct and satisfactory conclusion as to whether or not requiring the "jitney" operators to procure such bond, and not the other classes of common carriers of passengers for hire in the city, is so unreasonable or such a discrimination as to make this feature of the ordinance void. From our study of the facts and the law applicable we think it reasonably certain that the record shows three separate and distinct classes of common carriers of passengers for hire in said city (outside of the steam and interurban railways not under consideration), towit: first, the street car; second, the ordinary hack and automobile, and, third, the "jitney." Clearly, the city so regarded them and acted upon such distinction.

In the case of Southwestern, etc., Co. v. City of Dallas, 174 S. W. Rep., 636, is reported an exhaustive and able opinion by the Court of Civil Appeals at Dallas, through Judge Rasbury,—an opinion which appeals strongly to us as correct on this subject. In that case the appellant therein attacked an ordinance of the City of Dallas, which, briefly stated, imposed a tax of $2 for each pole of appellant, and specially excepted therefrom any such tax on the poles of the street car company and of another telephone company, the competitor of the appellant therein. The appellant therein claimed that that was class legislation, discriminated against it and violated the Federal and State Constitutions on the subject. Judge Rasbury states the contention of appellant therein in these words:

"It is next urged by appellant that the provisions of the ordinance are in violation of section 3, article 1, of our Constitution because discriminatory, and hence denies to appellant equal protection of the laws, and is in violation of section 1, article 8, of our Constitution providing for equal and uniform taxation of citizens of the State and in violation

of section 1, article 14, of the Federal Constitution, guaranteeing to citizens of all the States equal protection of the laws."

We quote, with approval, what he says, as follows:

"Class legislation or laws that affect a particular class are not unenforcible for that reason alone. The right of the Legislature to classify persons, corporations, or subjects for taxation, regulation, or restriction in the broadest sense is not an open question under either our State or national Constitution, and the right to classify includes the right to exempt, as does the right to exempt include the concurrent right to discriminate. The rule of law in reference to the right of classification in the light of the constitutional provisions urged by appellant in force in this State is, of course, the rule adopted by the Supreme Court of the United States in applying to the State Constitutions and laws that provision of the national Constitution which guarantees to all the citizens of all the States of the United States the equal protection of the laws. In the case of The Union Insurance Co. v. Chowning, 86 Texas, 654, 26 S. W. Rep., 982, 24 L. R. A., 504, the rule in this State with reference to classification, was stated as follows:

" 'When legislation applies to particular bodies or associations, imposing upon them additional liabilities, it is not open to the objection that it denies to them equal protection of the laws, if all persons brought under its influence are treated alike under the same conditions.'

"The rule cited is from Missouri Pacific Railroad Co. v. Mackey, 127 U. S., 205, p. 209, 8 Sup. Ct., 1161, 32 L. Ed., 107, and is the present existing general rule in this and most, if not all, the other States of the Union, and under the rule nearly every conceivable character of classification, so long as it is reasonable and just, has been sustained. In the same case it is further said, 'If all persons subject to it are treated alike under similar circumstances and conditions in respect both of the privileges conferred and the liabilities imposed,' the constitutional inhibition has no application. It is also said in Magoun v. Illinois Trust & Savings Bank, 170 U. S., 283, 18 Sup. Ct., 594, 42 L. Ed., 1037:

" 'What satisfies this equality has not been, and probably never can be, precisely denied. Generally it has been said that it "only requires the same means and methods to be applied impartially to all the constituents of a class, so that the law should operate equally and uniformly upon all persons in similar circumstances" ' (citing Kentucky Railroad Tax Cases, 115 U. S., 321, 6 Sup. Ct., 57, 29 L. Ed., 414).

"It was further said in Magoun's case, supra, that:

" 'It does not prohibit legislation which is limited, either in the objects to which it is directed or by the territory within which it is to operate. . . . But what is the test of likeness and unlikeness of circumstances and conditions? These expressions have almost the generality of the principle they are used to expound, and yet they are definite steps to precision and usefulness of definition, when connected with the facts of the cases in which they are employed. With these for illustration it may be safely said that the rule prescribes no rigid equal-

ity and permits to the discretion and wisdom of the State a wide latitude as far as interference by this court is concerned.'

"It is also said in the same case that the rule—'is not without limitation, of course. "Clear and hostile discriminations against particular persons and classes, especially such as are of unusual character, unknown to the practice of our governments, might be obnoxious to the constitutional inhibition." ' Bell's Gap Railroad v. Pennsylvania, 134 U. S., 232, 10 Sup. Ct., 533, 33 L. Ed., 892.

"But it was also said, in Brown-Forman Co. v. Kentucky, 217 U. S., 563, 30 Sup. Ct., 578, 54 L. Ed., 883:

" 'This restriction does not compel the adoption of "an iron rule of equal taxation," nor prevent variety in methods of taxation or discretion in the selection of subjects, or classification for purposes of taxation of either properties, business, trades, callings or occupations. This much has been over and over announced by this court.'

"Under the rule stated in the several ways by the citations quoted, what is the position occupied by appellant, and what equal protection of the law has it been denied, and what lack of equality or uniformity is shown by the ordinance as between appellant and similar concerns similarly situate? None we conclude. We do not understand that the rule which permits legislative bodies to classify persons, corporations, trades, businesses, subjects, etc., in order that the burdens of government may be justly and equally borne, denies them the right to classify classes. The rule announced by our Supreme Court in Insurance Co. v. Chowning, supra, comprehends such necessity in the varied and complex situations necessarily arising from the different situations and conditions of those who are to be so charged when it declares that the test shall be that all of the constituents of the particular class shall be 'treated alike under like conditions.' The rule, as stated in Magoon's case, also contemplated the classification of classes in the holding that all should be treated 'alike under like circumstances and conditions, both in the privilege conferred and the liabilities imposed.' The right to subdivide a given class when such class is existing under dissimilar circumstances and conditions is sustained in Texas Co. v. Stephens, 100 Texas, 628, 103 S. W. Rep., 481, where it is said:

" 'Persons who, in the most general sense, may be regarded as pursuing the same occupation, as, for instance, merchants, may thus be divided into classes and the classes may be taxed in different amounts and according to different standards. Merchants may be divided into wholesalers and retailers, and, if there be reasonable grounds, these may be further divided according to the particular classes of business in which they may engage.'

"An apt illustration of the right to classify classes is found in the case of Pacific Express Co. v. Seibert, 142 U. S., 339, 12 Sup. Ct., 250, 35 L. Ed., 1035, the issue being the validity of an Act of the Missouri Legislature imposing a tax upon all express companies carrying on the business of transportation on contracts for hire with railroad or steam-

boat companies, but exempting all other concerns carrying on the business and owning its own means of transportation, such as steamboat and railroad companies. This Act was attacked upon the same grounds that the ordinance in the instant case is attacked. The classification was sustained, the Supreme Court of the United States holding there was a vital and essential distinction between express companies defined by the Act and those concerns exempted from the tax, in that railroads paid taxes upon their roadbeds, rolling stock, and other tangible property, and generally upon their franchise, as did steamboat companies, while on the other hand, express companies of the kind defined by the Act have no tangible property of consequence, and that the exemption was a just discrimination in order that the burdens of government might be equally borne. Is there then such essential distinction between those exempted by the ordinance here involved and appellant, as justifies the classification? We conclude there is. The ordinance levies the charge of $2 per pole against all persons or corporations occupying the streets of the city therewith, and excepts therefrom all persons or corporations owning and using poles in the operation of street railways and those which, by the terms of their franchise, pay to the city a proportion of their gross receipts. The ordinance, fairly construed, assumes that other persons and corporations occupy the streets with poles similar to those of appellant. The undisputed facts show, which we have not stated before, that several street railways occupy the streets of the city with their trolley poles, whereon wires are strung, to be used in propelling their cars by electricity; that another telephone company has poles upon the streets similar in all respects to those of appellant and used for the same purpose; that said other telephone company is operating under a franchise by which it pays to the city 4 per cent of its annual gross receipts, furnishes free one duct in its underground conduits and one cross-arm on its poles for police and fire alarm purposes, together with sixty-three free telephones; that appellant does not pay the city a proportion of its earnings, yet its earnings, as indicated by the evidence, is two-thirds greater than those of the competing company; that the street railways, exempted from said ordinance by the provisions of the city charter (art. 10, sec. 1, cl. D) are required by law to pay the cost of paving the streets between their rails and two feet outside such rails, and may be required to drain and light streets over which they pass, and to construct and keep in repair bridges and crossings, as well as construct and maintain culverts and drains on streets over which they pass. Charter, art. 2, sec. 8, cl. 26. These facts indicate the inequality of the contributions to the city for the privileges enjoyed by appellant and those exempted from the provisions thereof and, in our opinion, sustain the discrimination as lawful, and the finding of the jury that they are reasonable. The matter of the payment of other taxes is, in our opinion, immaterial and beside the issue. Those exempted, as well as appellant, pay an ad valorem tax upon their tangible property, including their franchise, at least such tangible assets are subject to an ad valorem tax, and the presumption is that it has

been so subjected. All tax payments on tangible assets thus properly eliminated, since equal, it comes to this: That the constituent class to which appellant belongs is contributing a much less amount for the privilege of using the streets with its poles than are those exempted from the provisions of the ordinance, and, that being true, it follows, as matter of course, that there has been no arbitrary or unlawful classification."

In the recent case of St. Louis, etc., Ry. Co. v. Griffin, 171 S. W. Rep., 703, p. 706, our Supreme Court, through Chief Justice Brown, quoting from H. & T. C. Ry. Co. v. Dallas, 98 Texas, 396, said: "The power of the Legislature to regulate the use of property and the carrying on of business so as to protect the health, safety and comfort of citizens is recognized by all of the authorities and its use is not to be defeated by the mere fact that loss or expense may be imposed upon the owners of the property or business. Fertilizing Co. v. Hyde Park, 97 U. S., 659, 24 L. Ed., 1036."

In the case of Patsone v. Pennsylvania, 232 U. S., 138, 34 Sup. Ct., 281, 58 L. Ed., 539, it is shown that the State of Pennsylvania, in order to protect its wild game, passed a law making it an offense for a resident unnaturalized alien to own or be possessed of a shotgun or rifle, and also forfeited the gun where such person was shown to own or be possessed of it. The Act was attacked as an unjust discrimination and deprived the alien of his property contrary to the Fourteenth Amendment to the United States Constitution. The United States Supreme Court in that case said:

"Under the Fourteenth Amendment the objection is twofold, unjustifiably depriving the alien of property and discrimination against such aliens as a class. But the former really depends upon the latter, since it hardly can be disputed that if the lawful object, the protection of wild life (Geer v. Connecticut, 161 U. S., 519, 16 Sup. Ct., 600, 40 L. Ed., 793), warrants the discrimination, the means adopted for making it effective also might be adopted. The possession of rifles and shotguns is not necessary for other purposes not within the statute. It is so peculiarly appropriated to the forbidden use that if such a use may be denied to this class, the possession of the instruments desired chiefly for that end also may be. The prohibition does not extend to weapons such as pistols that may be supposed to be needed occasionally for self-defense. So far, the case is within the principle of Lawson v. Steele, 152 U. S., 133, 14 Sup. Ct., 499, 38 L. Ed., 385. See further, New York ex rel. Silz v. Hesterberg, 211 U. S., 31, 29 Sup. Ct., 10, 53 L. Ed., 75; Purity Extract & Tonico Co. v. Lynch, 226 U. S., 192, 33 Sup. Ct., 44, 57 L. Ed., 184.

"The discrimination undoubtedly presents a more difficult question. But we start with the general consideration that a State may classify with reference to the evil to be prevented, and that if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. A lack of abstract symmetry does not matter. The question is a prac-

tical one, dependent upon experience. The demand for symmetry ignores the specific differences that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named. Lindsley v. National Carbonic Gas Co., 220 U. S., 61, 80, 81, 31 Sup. Ct., 337, 55 L. Ed., 369, 378, 379, Ann. Cas., 1912C, 160. The State 'may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses.' Central Lumber Co. v. South Dakota, 226 U. S., 157, 160, 33 Sup. Ct., .66, 57 L. Ed., 164, 169; Rosenthal v. New York, 226 U. S., 260, 270, 33 Sup. Ct., 27, 57 L. Ed., 212, 216 Ann. Cas., 1914B, 71; L'Hote v. New Orleans, 177 U. S., 587, 20 Sup. Ct., 788, 44 L. Ed., 899. See, further, Louisville & N. R. R. Co. v. Melton, 218 U. S., 36, 30 Sup. Ct., 676, 54 L. Ed., 921, 47 L. R. A. (N. S.), 84. The question, therefore, narrows itself to whether this court can say that the Legislature of Pennsylvania was not warranted in assuming as its premise for the law that resident unnaturalized aliens were the peculiar source of the evil that it desired to prevent. Barrett v. Indiana, 229 U. S., 26, 29, 33 Sup. Ct., 692, 57 L. Ed., 1050, 1052.

"Obviously the question so stated is one of local experience, on which this court ought to be very slow to declare that the State Legislature was wrong in its facts. Adams v. Milwaukee, 228 U. S., 572, 583, 33 Sup. Ct., 610, 57 L. Ed., 971, 977. If we might trust popular speech in some States, it was right, but it is enough that this court has no such knowledge of local conditions as to be able to say that it was manifestly wrong. See Trageser v. Gray, 73 Md., 250, 20 Atl. Rep., 905, 9. L. R. A., 780, 25 Am. St. Rep., 587; Com. v. Hana, 195 Mass., 262, 81 N. E. Rep., 149, 11 L. R. A. (N. S.), 799, 122 Am. St. Rep., 251, 11 Ann. Cas., 514."

In our opinion the agreed facts in this case show such a marked distinction between the three characters of passenger carriers for hire and the extent and manner of their use of the streets as to justify the city in requiring the operator of the "jitney" to give such bond and in not requiring either of the other classes of carriers to do so, and that we can not, therefore, hold this provision of the ordinance void.

In connection with this matter the applicant contends, in effect, that it is unreasonable and oppressive to require him to take out the indemnity insurance from some company designated by the ordinance and that instead, he should be permitted to give personal sureties if he so desires, and, he suggests, that there might be but one insurance company which would issue such policy in the whole State. But no such state of fact is shown before us. The reason why the city requires an indemnity by an incorporated company instead of personal sureties is made to appear clearly by the agreed facts to the effect, as shown by subdivision 27 of the agreed facts copied above. It is unnecessary to again copy it here. Nothing in this record is shown which would justify us to conclude that said ordinance in the particulars mentioned

is unreasonable or oppressive. On the contrary, we are impressed that they are reasonable and proper,—especially in view of the agreed facts.

Again, the applicant attacks those provisions, in effect, requiring him to select a given route over which he will run his motor bus,—"jitney"— designating the termini, and requiring him to stick to that route and termini and prohibiting him from operating elsewhere and requiring him to run, or cause to be run, his "jitney" for not less than twelve consecutive hours out of every twenty-four, except on Sundays, and a reasonable time for going to and from meals and in case of accidents, breakdowns or other casualties, or upon the surrender of said license.

The applicant's able attorneys, as we understood, both in their oral argument and brief herein, admitted and contended that the operators of the "jitneys" were common carriers. There can be no question of the correctness of this. Then, as common carriers, they subject themselves to all reasonable regulations in the matters mentioned. Being common carriers and subjecting themselves to such regulations, the public unquestionably has rights in the premises. As we understand the ordinance, the city does not undertake to, itself, fix the route and termini of the "jitneys," but, with some restrictions, permits the operators of the "jitneys" themselves to make such selection. If they are to operate as common carriers, then the public has the right to know when and where they will operate and to require them to do so with promptness and regularity. It would certainly be unreasonable to the public that after they have selected and established their route and termini, they could, at any time, abandon that and take up some other. They have no more right to thus shift from time to time and place to place than the street car carriers would have so to do. Suppose, for instance, the street car system operating on regular schedule time, as they are required to do from day to day and within reasonable hours, should for any reason, without necessity, conclude that on one day or all the days of one week, they would not run their cars on their lines north and south, but instead run them east and west, or vice versa. The public would be so inconvenienced by this as to make such a condition of things intolerable and as a matter of fact it would not be tolerated. So with the "jitney," they select a certain route and termini. Their patrons, the public, adjusts itself to this and depends upon them to run that route on schedule time within reasonable hours. But the "jitneys" without necessity conclude that for a given day or for each day of a given week they will not run on that line at all, but run on another and a different one. The disappointment and inconvenience and trouble to the public that had adjusted itself otherwise would be an outrage to such an extent that such condition of things by the "jitneys" would not and should not be tolerated. The ordinance on this subject, it seems to us, instead of being unreasonable, is most reasonable, and permits them at any time to apply to the city for a change in their route or termini, and the ordinance provides that the city, in its discretion, can make such desired change. The agreed facts show that the "jitneys" now operate an average of fifteen hours each

day. Surely, that they should be required by the ordinance to operate, with the exceptions mentioned, twelve hours is not unreasonable and violates no law. It seems to us that the ordinance makes every exception in this regard that would be either necessary or proper.

Again, the applicant attacks that subdivision of section 2 of the ordinance following subdivision (g), wherein it is prescribed that the commissioners may grant the application for license to operate the "jitney" as applied for, or grant it in modified form, or under certain conditions, decline to grant it at all.

As to this, we think the applicant is not in position to attack this provision, for the agreed facts show that he has not been denied any license, and in fact has made no application whatever himself, but refused to do so. Under such circumstances the rule is as stated in Kissinger v. Hay, 113 S. W. Rep., 1005, expressly approved and adopted by this court in Ex parte Wilson, 56 Texas Crim. Rep., 1, that where one has not applied and been refused, he can not complain. Young v. City of Colorado, 174 S. W. Rep., 996, 8 Cyc., 787-9. The rule prevails in the United States Supreme Court, to the effect that it will not hear objections to the constitutionality of any law from those who are themselves not affected by such provisions. That in order to require the court to pass upon such questions they must affirmatively show they have been denied rights by reason of it. (Southern R. Co. v. King, 217 U. S., 524, 534, 54 L. Ed., 868, 871, 30 Sup. Ct. Rep., 594; Engel v. O'Malley, 219 U. S., 128, 135, 55 L. Ed., 128, 135, 31 Sup. Ct. Rep., 190; Standard Stock Food Co. v. Wright, 225 U. S., 540, 550, 56 L. Ed., 1197, 1201, 32 Sup. Ct. Rep., 784; Yazoo & M. Valley R. Co. v. Jackson Vinegar Co., 226 U. S., 217, 219, 57 L. Ed., 193, 194, 33 Sup. Ct. Rep., 27, Ann. Cas., 1914B, 71; Darnell v. Indiana, 226 U. S., 390, 398, 57 L. Ed., 267, 272, 33 Sup. Ct. Rep., 120; Plymouth Coal Co. v. Pennsylvania, 232 U. S., 531, 544, 58 L. Ed., 713, 719, 34 Sup. Ct. Rep., 359; Missouri, K. & T. R. Co. v. Cade, 233 U. S., 642, 648, 58 L. Ed., 1135, 1137, 34 Sup. Ct. Rep., 678.) However, we might state that as we understand by it the city could not, "without rhyme or reason," arbitrarily refuse to issue to the applicant a license under said ordinance if he complied therewith. But, as we understand that provision, the city reserves to itself authority to refuse to issue license to any and everyone under certain conditions. For instance, suppose others, including, or even excluding, the applicant had already applied for and been granted license on certain routes to a large number, and to such a number as that any others on it would be a great menace to public safety. It is shown by the agreed facts that there were 300 of these "jitneys" constantly running up and down the two main business streets in the city. Say they were equally divided; then there would be seventy-five on one side of the street running one way and seventy-five on the other side running in an opposite direction. Under such circumstances, surely the city would have the right to say that such a number, or even a much less number, is sufficient, and to permit a greater number would be too great a menace constantly to life and

limb and property. Under such circumstances the city would not only have the discretion to refuse another license, but it would be its imperative duty to absolutely refuse all others on those streets. In any event, this provision of the ordinance, in our judgment, is not unlawful, unreasonable or void. Fischer v. St. Louis, 194 U. S., 361, 24 Sup. Ct. Rep., 673, 48 L. Ed., 1018; Ex parte Broussard, 74 Texas Crim. Rep., 333, 169 S. W. Rep., 660, and authorities therein cited; Kissinger v. Hay, supra, and authorities therein cited.

We see nothing in the ordinance that would make it obnoxious to our Constitution or any statutory provision preventing monopolies. It occurs to us that the very reverse of this is true.

As we view the matters, there is no necessity of discussing any other question. Those discussed and decided, we think, dispose of the case.

The applicant, in our opinion, is not entitled to a writ of habeas corpus, nor discharge if one had been granted. It will, therefore, be ordered by the court that his application be in all things denied and that he be and is hereby remanded to the custody of the proper officer, or his successor, who held him when this court took jurisdiction and admitted him to bail.

*Relator remanded to custody.*

HARPER, Judge.—I concur in the result reached, and may write my views later.

DAVIDSON, Judge, dissenting.

[Rehearing denied June 9, 1915.—Reporter.]

*July 19, 1915.*

DAVIDSON, Judge (dissenting).—There are some questions which ought to be recognized as settled law with reference to municipal corporations: First, that such corporation is of legislative creation; second, that it can only exercise such authority as has been expressly conferred; third, that such authority must be within constitutional limitation; fourth, that its powers are subordinate to general legislation; fifth, that if there be a doubt of its right to exercise authority or power to act, that doubt must be resolved in favor of the grantor and against the grantee; sixth, that its acts and ordinances must be within the grant, and, seventh, its ordinances must be reasonable, fair and not discriminating. I regard these propositions as axiomatic and need no elaboration, discussion or citation of authorities. Within these rules the city may control its streets and regulate their use. It should be understood that a city and its granted powers are predicated upon the basic principle that they are to be used and exercised for the benefit of those who travel or use such streets, and this without discrimination. To this end and for this purpose these streets are laid out and kept in repair. It may be stated also as axiomatic that the citizen is not made for the street; the street is made for the citizen and his use. The city

can not prohibit such use but may reasonably regulate it. That the city may regulate the use of the streets ought not to be questioned, but such regulation should be fair and reasonable. Autocratic power does not belong to nor inhere in our republican form of government either in the State, legislative department or municipal government. Citizens Savings & Loan Assn. v. Topeka, 20 Wall., 655 (22 Law Ed., 455). All power is inherent in the people, not the government, and in delegating authority to the various departments of government our citizenship did not surrender their inherent power, and such as has been delegated may be recalled or modified by amendment to the Constitution, or by the ordination of a new Constitution. The diversification of this delegation of power has been so given as to prevent usurpation of power or embezzlement of authority. The Legislature is supreme in lawmaking and its authority can not be invaded nor delegated, and it is bounded by constitutional limitations. Cities are subordinate and must live within the limits of its grant or charter. Police power is but an incident to legislation. Whatever may be the necessity for its exercise, that necessity is limited by impassable barriers. Withdraw the legislative delegated authority and the police power passes with that withdrawal. The Legislature can not exceed or transfer its delegated authority any more than can the judiciary or executive. While these statements are general and may be regarded as legal platitudes in a sense, still it is well to have frequent recurrence to first principles, "lest we forget," and it may be absolutely necessary to do so that precedents may be kept within the reason of the law and the purpose of the written Constitution. It may be well also to restate that great truth, sometimes overlooked, that the government is made by man and for his benefit, and that man is not made by nor for the government. Recent history—legislative and judicial—does not seem to have kept these propositions well or strictly in hand or in memory. Police power, whatever may be the necessities, is operative only to subserve our citizenship, their rights and their interest. It can not be made an engine of oppression, nor used to destroy the rights of our people, nor can it be resorted to to paternalize our government. These rights are sacred whether in the State at large or within the confined limits of municipal corporations. Such authority should be confined to the regulation of matters appertaining to such corporation and the exigencies of such territory, and this only when the matters are not covered by the general law of the land. There are many things doubtless affecting the aggregation of people in cities which do not affect the people at large in the State. Under such circumstances cities should have sufficient police power for reasonable regulation. One of such matters is reasonable control of streets. This regulation should be exercised for the benefit of the citizenship of the city and those who use the streets for necessary purposes always attended by the fundamental rule that such use must be exercised so as not to injure the rights of others or the public rights. It occurs to me that the ordinance in question, viewed in the light of other ordinances mentioned in the statement of facts, is not

only discriminating ·and unreasonable, but intended to be prohibitive, and its bond feature is not authorized, and, in my judgment, void. Illustrative of the above, an inspection of one ordinance discloses that all autos of every size and description are authorized to carry passengers throughout and all over the City of Fort Worth by paying a license of $3 per annum, and for this no bond or insurance policy is asked or required in the way of indemnity. Under the other ordinance an auto carrying five passengers must pay $10 per annum; if it carries seven passengers·it must pay $20 per annum, and if above seven passengers it must pay $30. In addition to these matters these autos or jitneys are confined to specific or segregated lines and streets. Besides this, each auto or the licensee under the second ordinance must take out an *insurance policy to protect such licensee from "legal liability," provided such policy can in no event redound to the benefit of passengers carried in such auto.* For this policy or indemnity contract the licensee must pay the exacted fee or premium demanded by the insurance companies. There may be no limit even set to the amount of the premium or fee to be paid. Otherwise the license can not be obtained as authority for running the jitney. The insurance company, no one else, can sign the contract. If it demands $500 as a premium or fee it must be paid, and this is made a prerequisite before the licensee can obtain the necessary license to operate his auto· or jitney. Under one ordinance the auto or common carrier only·pays $3 for the privilege of becoming a common carrier in the city limits for the space of one year. Under the other ordinance the auto, which we may call a jitney, pays from $10 to $30, besides the premium demanded by the insurance company. This looks to me to be sharply discriminating. It may be asked why this difference is made under the two ordinances. Can it be said that the passengers are less safe in one than in the other auto? If so, how or why? Can it be urged that the traveling public on the streets is less liable or more liable to damage from one of the autos than from the other? If so, how or why? It may be further asked if the public· along the street is any more safeguarded by the exaction of from $10 to $30 than by the demand of $3. It occurs to me these ordinances can not be reconciled along reasonable lines. It is not clear to my mind why the indemnity contract or insurance policy is demanded under one ordinance and not under the other. It does not redound to the benefit of either the passengers in the car, for they expressly are excluded, or those traveling along the public streets, for the simple reason that by its terms the *"legal liability" is limited to the licensee of the vehicle driven.* Neither the passengers nor the public have any interest in the contract or policy. Nor is it clear to my mind how this indemnity policy executed in favor of the licensee could be any protection to anybody, unless it be the licensee. Before his legal liability could possibly arise that liability must be fixed in some way definitely upon the licensee, and if he were called upon to pay money in any way for damages or injury to people on the streets, he might possibly have a cause of action against the insurance company. This, if true, certainly would

result in a multiplicity of suits to say the least of it, the end of which might be to defeat all rights even of the licensee. This indemnity contract is a matter exclusively between the jitney owner or licensee and the insurance company—made so on its face, without even specifying what is meant by the term "legal liability." It may be asked, does this term "legal liability" mean an indemnity of the licensee for what he may pay out for damages or cause to be made to pay out for damages, or is it protection against him from prosecution for injury of a criminal nature he may commit in running over or killing people on the streets? If it protects him against liability for his violation of criminal statutes, certainly it would hardly be maintainable against the insurance company. Indemnity of a party against his own criminal or tortuous act would hardly be a legal contract. But viewed in another light, this indemnity contract under the ordinance is and can only be a matter between the licensee and the insurance company, that is, it is a contract between third parties to which the city is not a party and is not and can not be made a party, and in which the municipal corporation as such has not and can have no interest. It could not change the relation of the third parties to each other by making a cause of action or defeating a cause of action or in lessening or enhancing the liability for acts between third parties. The public or the city has no interest in it. It is a matter between the licensee and the insurance company. There is ample authority, as I understand the law, based on sound principles, for the proposition that the city can not demand or require bond or contracts inuring to or operating only between third parties. This has been a matter of adjudication frequently. In support of the above proposition I cite Park Bros. v. Sykes, 67 Minn., 153; Breen v. Kelly, 45 Minn., 352; Philadelphia v. Madden, 23 Pa. Co. Ct., 39; Lyth v. Higston, 14 App. Div., 1143 (N. Y. Sup., 643); Jefferson v. Asch, 53 Minn., 446. To the same effect is Taylor v. Dunn, 80 Texas, 652; House v. Houston Waterworks Co., 88 Texas, 233; Galveston Ry. Co. v. Galveston, 90 Texas, 411. Many other cases could be cited.

The further proposition, to my mind clear, is, that a city can in no event demand indemnity bonds except for municipal purposes and to protect city contracts, these contracts inuring to the benefit of the municipal corporation. As between third parties the city has no concern and can neither lessen nor aggravate any cause of action between the citizens of a municipality, nor can it create a cause of action between them. For this reason it seems to me the city ought to be powerless to demand of one citizen an indemnity contract in favor of another citizen. But if, in any event, this can be done, there should at least be expressly granted authority in the city charter for so doing. This has not been done to the City of Fort Worth. I do not care to further discuss this question, except to observe that the bond must be given with a corporation as surety, and such bond could not be signed by private persons as sureties, though the wealthiest in the State. This is additional discrimination and sufficient to nullify the ordinance.

Another question I mention briefly. The fees demanded are not, in my judgment, license fees. It is a tax pure and simple, and a tax of a graduated nature ranging from $10 to $30 according to the number of passengers carried in the car or auto. If it is a license fee in fact, or so intended, it should make the same equal alike to all autos without reference to the number of passengers carried. This was done under the ordinance which demands a $3 license fee. The fee, which is, in my judgment, a tax under the ordinance under which relator was arrested, is not fixed on or confined to the auto as such, but to the number of passengers the auto carries; not as a regulation of the jitney, but as a tax proportioned to the number of passengers carried. This is not only a tax, but it is one, in my judgment, entirely discriminatory on its face as well as in its operation. The city is not authorized to levy this character of tax, therefore in the ordinance it is denominated a license fee. Under the guise of a license fee a tax, and a graduated tax at that, is levied and demanded. A license fee must be commensurate with the expense of maintaining the regulations, and can not be used as a mere means of putting money into the treasury except for that purpose, and can not be used as a revenue measure.

There is another matter of constitutional law involved in this case to which I might refer; that is, where a constitutional right exists in favor of the citizen, the power does not exist in the State or Legislature to require the giving of a bond which materially abridges or entrammels the exercise of such constitutional right.

This rule is well recognized both in criminal and civil cases. In Callan v. Wilson, 127 U. S., 540 (32 Law. Ed., 223) Justice Harlan in an elaborate opinion, concurred in by the entire court, held the right of trial by jury could not be abridged by requiring an appeal to a higher trial court when an appeal bond would have to be given as a prerequisite to secure such jury trial. That case has not been overruled nor modified. Many cases were reviewed bearing on principles of constitutional law. Trial by jury is not a more sacred right than the right of the citizen to pursue any lawful calling or business, even the right to use the streets of a city. Subject to lawful police regulation, as above observed in this opinion, such a business or calling as carrying passengers in a carriage or auto through the streets, and the general use of the public streets by the auto or "jitney" are matters as much of constitutional right as that of trial by jury, and can no more be abridged than the trial by jury. Police regulations or power must always act uniformly upon all alike in the same situation and there can be no discrimination. There may be classification of subjects of police regulations where the classification arises from the nature of the subjects, and such subjects show a difference in the expense of maintaining reasonable police regulations; so, in this case there could be no different fees and regulations. However, such classification must be reasonable and just, and founded upon the nature of the subjects for classification. It can never be arbitrary, nor rest upon the mere will or caprice of the city, State or legislative authority. The discriminations in the

ordinances here involved are not reasonable nor just, but on their face, when the subjects of the nature of the discriminations are considered, show they are illegal, arbitrary, and depend upon the mere will of the legislative branch of the city.  It may be matter of doubt that an ordinary auto is more hazardous to the public than an ordinary two-horse carriage or similar vehicle.  Certainly one of two autos of the same size, with same or even different seating capacity, is not more hazardous or dangerous to the public than the other, nor does it, strictly speaking, require more expense in regulation than the other.  Yet none of these regulations apply to carriages in Fort Worth, and the discrimination between the autos of the same carrying capacity under one ordinance as against those under the other ordinance is purely arbitrary and exists without reason or justification, and only by the mere will of the ordinance making power.  For all the above reasons the ordinance is void under the Fourteenth Amendment to the Federal Constitution, which provides that no person shall be deprived of life, liberty or property without due process of law or be denied equal protection of the law as well as under the provisions of the State Constitution and the Bill of Rights, which are to the same effect.

I have not discussed this ordinance in relation to other common carriers of the city, one of which is the street railway company, but I have said enough to convey some of the ideas I have for disagreeing with my brethren in upholding this ordinance.  I, therefore, have reached the conclusion that the ordinance is unreasonable, is discriminatory, is intended to be prohibitive, and its bond feature is void, and that the alleged license fee is a tax and not a license.  I can not, therefore, concur with my brethren in upholding this ordinance.